**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JANE DOE on behalf of BABY DOE, a minor, and PATRICIA CAVALLARO-KEARINS, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>     v.<br><br>ANTHEM HEALTHCHOICE ASSURANCE, INC., d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD, and d/b/a ANTHEM BLUE CROSS; and ANTHEM HP, LLC, d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD HP, and d/b/a ANTHEM BLUE CROSS HP,<br><br>    Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Jane Doe on behalf of her child Baby Doe, a minor, and Patricia Cavallaro-Kearins bring this class action for damages, equitable relief, and injunctive relief against Anthem HealthChoice Assurance, Inc., d/b/a Anthem Blue Cross and Blue Shield and d/b/a Anthem Blue Cross; and Anthem HP, LLC, d/b/a Anthem Blue Cross and Blue Shield HP and d/b/a Anthem Blue Cross HP (collectively referred to herein as "Defendant" or "Anthem"). Plaintiffs allege the following based upon personal information as to allegations regarding themselves, on their own investigation, and on the investigation of their counsel, and on information and belief as to all other allegations.

## NATURE OF THE ACTION

1. There is a mental health crisis in this country and in this state. It is afflicting men and women, children and adults, and people of all income levels and backgrounds. And it is exacerbated by health insurance companies, like the Defendant, that mislead people in need of qualified providers by publishing grossly inaccurate directories of doctors and therapists. These

- 1 -

inaccurate directories – which purport to list qualified professionals who are supposedly in-network with Defendant but are not – are known as "ghost networks."

2.     "Ghost networks" are directories provided by health insurers that list health care providers that purportedly are in-network with their insurance plan, but in reality are not. These ghost networks are also replete with errors and duplications, which make them inaccurate, incomplete, deceptive, and misleading. Mental health provider directories are more likely than those in any other medical specialty to be ghost networks.

3.     The Defendant's publication of an inaccurate provider directory is not just an inconvenience for people searching for mental health providers; it is far more insidious and costly. By publishing an inaccurate provider directory where the vast majority of doctors listed – more than 80% – either don't exist, are listed with non-working telephone numbers, or are listed with inaccurate telephone numbers – making them virtually impossible to contact – or are not actually in-network with Defendant, the Defendant did not just mislead people, but damaged them.

4.     These damages are not just financial but often contribute to exacerbating patients' mental health problems. The people using the Defendant's provider directory are often desperate for mental health care for themselves, for their children, and for their loved ones. And the inaccurate provider directory actually causes harm. Some patients, like the Plaintiffs, have had their treatment delayed. Many, like the Plaintiffs, have had to utilize out-of-network doctors and as a result have incurred thousands of dollars in mental health medical expenses.

5.     Other patients have abandoned their search for care, resulting in serious mental health consequences and complications.

6.     Mental health care is supposed to be covered by the Defendant's insurance policy. In reality, it is not: there are almost no mental health providers in New York who actually accept the Defendant's insurance, who are "in network," and who accept new patients. And thus, the promised coverage is largely illusory. When there are very few – or no – doctors who are in-network with Defendant – or when doctors are in-network but are not within a reasonable distance – such a network not only violates the law, regulations, standards, and guidance, it fails the network adequacy common sense smell test.

7.     The Defendant knowingly publishes an inaccurate provider directory; and it does so for several reasons.

8.     First, the Defendant publishes an inaccurate and misleading directory – which contains thousands of providers who supposedly participate in the Defendant's network but do not – in order to attract potential customers. The Plaintiffs, and other members of the proposed class, are participants in the Federal Employees Health Benefits ("FEHB") Program. As such, they – and every other federal employee eligible for the FEHB – have multiple health insurance plan options. The Defendant competes against these other providers and does so by advertising benefits of its particular plans. And by publishing a seemingly robust, if secretly inaccurate, directory of participating providers, the Defendant is knowingly engaging in a deceptive advertising campaign intended to lure people – like the Plaintiffs – into choosing one of its plans.

9.     Second, by publishing a seemingly robust – but inaccurate – directory of providers, the Defendant is deceptively trying to appear to comply with federal requirements that its offered plans have an adequate network of providers who actually accept the Defendant's insurance.

10.     The Defendant's promise of an adequate network of qualified providers is deceptive advertising. The listings are inaccurate in numerous ways: some are listings of doctors

who don't exist. Others are listed with inaccurate or non-working telephone numbers – making them impossible to reach. Many of the doctors listed are not part of Defendant's network. Some of the listings include incorrect specialties for the doctor. In sum, these are deceptive business practices on the part of the Defendant.

11.     By publishing telephone numbers that are inaccurate, the Defendant sends patients on a wild goose chase searching for doctors covered by their plan. The time spent reaching wrong numbers or encountering non-working numbers is not just valuable time wasted, it is discouraging and contributes to patients abandoning their search for care. For people seeking mental health care for themselves or their children, this wild goose chase for in-network doctors is not small potatoes; it is a time-consuming, exhausting, frustrating experience that is detrimental to their mental health.

12.     Grossly inaccurate listings in a directory – and a directory essential for directing patients to needed medical care – are a violation of the federal No Surprises Act, the federal Mental Health Parity and Addiction Equity Act, the Defendant's contractual obligations to Plaintiffs, New York General Business Law §§ 349 and 350, New York Insurance Law § 4226, and the New York State Department of Financial Services' standards and guidance.

13.     The Plaintiffs – and other members of the proposed class – have suffered real injury and damages. The Plaintiffs have paid premiums for the Defendant's insurance plan for coverage that never existed or was grossly inadequate. The Defendant has failed to provide an adequate network of mental health providers who actually accept the Defendant's insurance or offer appropriate types of care. The Plaintiffs also suffered significant financial damage by having to pay thousands of dollars for out-of-network providers because there were no qualified in-network providers within a reasonable travel radius. The Plaintiffs also wasted time and were

frustrated by having to spend countless hours calling providers who the Defendant represented as being qualified and participating in the Defendant's network, only to find out that the phone numbers listed by the Defendant were wrong, that the providers did not offer the services listed in the Defendant's provider directory, were not qualified, or did not participate in the Defendant's network.

## JURISDICTION AND VENUE

14.    Federal law provides an essential element of Plaintiffs' claims.  Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

15.    This Court has personal jurisdiction over the Defendant because it can be found, resides, and/or transacts business in New York State, and it is headquartered in the State of New York and regularly conducts business in New York County.

16.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b).  The Defendant is a resident of and headquartered in this Judicial District, it conducts business in this Judicial District, and a significant portion of its activities took place within this Judicial District.

## THE PARTIES

**I.     Plaintiffs**

17.    Plaintiff **Jane Doe** is a resident of New York. She has been a member of the Standard Option Plan for more than five years.

18.    Ms. Doe is the mother of 8-year-old **Baby Doe** who has been covered by the Standard Option Plan for more than five years.

19.    Plaintiff **Patricia Cavallaro-Kearins** is a resident of New York. She has been a member of the Anthem health insurance plan known as the Blue Cross Blue Shield Service Benefit Plan FEP Blue Standard Option ("Standard Option Plan") since January 1, 2019.

## II.     Defendant

20.     Defendant Anthem is a health insurance company licensed to do business in New York. It is one of multiple health insurance companies with plans that are offered to federal employees under the Federal Employees Health Benefits ("FEHB") Program.

21.     In New York, Defendant operates under several different entities and under various trade names. Anthem HealthChoice Assurance, Inc. operates under the trade name Anthem Blue Cross and Blue Shield in 17 southeastern counties. Anthem HP, LLC operates under the trade name Anthem Blue Cross in 11 northeastern counties in New York.

22.     Prior to changing its name to Anthem HealthChoice HMO, Inc. in 2024, it operated as Empire HealthChoice Assurance, Inc.; and before that, as Empire HealthChoice Inc; and before that, as Empire Blue Cross and Blue Shield. Its website is www.empireblue.com, which when clicked brings the user to www.anthembluecross.com. These older names are relevant to this complaint because some people, providers, and materials still refer to "Empire."

### BACKGROUND & CONTEXT

## I.     The Mental Health Crisis in America

### A.     The Adult Mental Health Crisis

23.     There is a mental health crisis in the United States. According to the National Institute Mental Health National Survey on Drug Use and Health by the Substance Abuse and Mental Health Service Administration of 2021, there were an estimated 57.8 million adults in the U.S. with a mental illness. That is 22.8% of U.S. adults.[1]

24.     Younger adults reported a higher prevalence of mental health problems:

---

[1] National Institute of Mental Health, *Mental Illness Statistics*, https://www.nimh.nih.gov/health/statistics/mental-illness.

- Ages 18–25: 33.7% of adults reported having a mental illness.

- Ages 26–49: 28.1% of adults reported having a mental illness.

- Ages 50+: 15.0% of adults reported having a mental illness.

25.     Some 52.8% of the 57.8 million adults with any mental illness did not receive mental health services within the previous year.[2]

26.     Treatment rates for adults aged 18–25 were lower than for all other adults: some 55.4% of the age group went without treatment.[3]

27.     In 2021, an estimated 14.1 million adults in the U.S. had a *serious* mental illness, some 5.5% of the population.[4]

28.     In total, 34.6% of those with serious mental illness did not receive mental health services.[5]

**B.     The Child Mental Health Crisis**

29.     According to the Centers for Disease Control and Prevention ("CDC"), among adolescents aged 12 to 17 years old:[6]

- 15.1 percent have had a major depressive episode.

- 36.7 percent have had persistent feelings of sadness or hopelessness.

- 4.1 percent have had a substance use disorder.

---

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] Rebecca H. Bitsko et. al., *Mental Health Surveillance Among Children – United States, 2013–2019*, Ctrs. For Disease Control and Prevention (2022), https://www.cdc.gov/mmwr/volumes/71/su/su7102a1.htm (citations omitted).

- 1.6 percent have had an alcohol use disorder.

- 3.2 percent have had an illicit drug use disorder.

- 18.8 percent seriously considered attempting suicide.

- 15.7 percent made a suicide plan.

- 8.9 percent attempted suicide.

- 2.5 percent made a suicide attempt requiring medical treatment.

30.    The situation is so acute that the Surgeon General of the United States has described mental health as "the defining public health crisis of our time," and warned of the "devastating effects" of mental health challenges on young people.[7] This came as the suicide rate for young Americans jumped by 57 percent from 2001 to 2018, and pediatric visits for self-harm rose by 329 percent from 2007 to 2016.[8] The Surgeon General released a rare Advisory[9] titled *Protecting Youth Mental Health* urging that "every child ha[ve] access to high-quality, affordable, and culturally competent mental health care."[10]

---

[7] Matt Richtel, *The Surgeon General's New Mission: Adolescent Mental Health*, N.Y. Times, (Mar. 21, 2023), https://www.nytimes.com/2023/03/21/health/surgeon-general-adolescents-mental-health.html.

[8] Bommersbach et al., *National Trends in Mental Health-Related Emergency Department Visits Among Youth, 2011-2020*, J. of the Am. Med. Ass'n (May 2, 2023), https://pubmed.ncbi.nlm.nih.gov/37129655/.

[9] "A Surgeon General's Advisory is a public statement that calls the American people's attention to an urgent public health issue … . Advisories are reserved for significant public health challenges that need the nation's immediate awareness and action." *Protecting Youth Mental Health: The U.S. Surgeon General's Advisory*, Off. of the Surgeon Gen. (2021), https://www.hhs.gov/sites/default/files/surgeon-general-youth-mental-health-advisory.pdf.

[10] *Id.*

31.    Compounding this crisis are serious barriers to accessing needed mental health treatment. The CDC estimates that of the 1 in 5 children who have a mental, emotional, or behavioral disorder, only approximately 20 percent receive care from a mental health provider.[11]

32.    Non-white and uninsured children are even less likely to receive mental health care treatment.[12] In New York City, the disparate impact is great, with only approximately 11 percent of Asian American and Pacific Islander children reporting being connected to mental health care, 19 percent of Black children, and 20 percent of Latinx children.[13]

33.    The consequences of untreated mental illness in children and adolescents are profound and are associated with school failure, teenage pregnancy, unstable employment, substance use, violence including suicide and homicide, and poor medical outcomes.[14]

### C.    The Mental Health Crisis in New York

34.    According to Mental Health America, in 2022, an estimated 19.5% of adults in New York, approximately 2,972,000 people, suffered from a mental illness.[15]

---

[11] Ctrs. for Disease Control and Prevention, *Improving Access to Care, Children's Mental Health*, Children's Mental Health, https://www.cdc.gov/childrensmentalhealth/access.html

[12] *Mental Health Data Dashboard*, NYC Mayor's Off. of Cmty Mental Health, https://mentalhealth.cityofnewyork.us/dashboard/; *see also* Janet Cummings et al., *Geographic Access to Specialty Mental Health Care Across High-and Low-Income US Communities*, JAMS Psychiatry, (May 2017), https://pubmed.ncbi.nlm.nih.gov/28384733/ ("When examining the distribution of mental health professionals, 25.3% of the communities (2014 of 7959) in the highest income quartile had a mental health specialist physician practice vs 8.0% (637 of 7959) of those in the lowest income quartile… .").

[13] *Mental Health Data Dashboard*, supra note 12. These figures represent high school students who got help from a professional counselor, social worker, or therapist for an emotional or personal issue in the last 12 months.

[14] *School-Based Mental Health: Pediatric Mental Health Minute Series*, Am. Academy of Pediatrics, https://www.aap.org/en/patient-care/mental-health-minute/school-based-mental-health/.

[15] Mental Health America, *Adult Data 2022*, https://www.mhanational.org/issues/2022/mental-
(continued…)

35.    According to the Kaiser Family Fund mental health survey of 2023:

- 28.8% of New York adults reported symptoms of anxiety disorder.

- 19.4% of New York adults reported symptoms of depressive disorder.

- 31.4% of New York adults reported symptoms of anxiety or depressive disorder.[16]

## II.    Federal and State Requirements of Health Insurers

### A.    Federal and New York State Law Impose Additional Obligations on Health Plans to Ensure Accuracy of Provider Directories

36.    As discussed above, the federal government has expressed serious concern about the prevalence of ghost networks and the significant barriers they create to mental health care. In addition to the congressional inquiries and hearings, federal and state laws and regulations have been promulgated in an effort to protect consumers from the harms of ghost networks.

37.    In 2022, Congress passed the federal No Surprises Act, which includes a section entitled "Protecting Patients and Improving the Accuracy of Provider Directory Information" that establishes requirements for provider directories to help protect consumers from surprise bills from out-of-network providers.[17]

38.    The No Surprises Act requires health plans to publish and maintain accurate provider directories; specifically, insurance companies must update and verify their plans'

---

health-america-adult-data#six.

[16] KFF, *Adults Reporting Symptoms of Anxiety or Depressive Disorder During COVID-19 Pandemic*, https://www.kff.org/other/state-indicator/adults-reporting-symptoms-of-anxiety-or-depressive-disorder-during-covid-19-pandemic/?currentTimeframe=0&selectedRows=%7B%22 states%22:%7B%22new-york%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22 Location%22,%22sort%22:%22asc%22%7D.

[17] Pub. L. No. 116-260, 134 Stat. 1182, Division BB, (2020), https://www.congress.gov/bill/116th-congress/house-bill/133/text; adding 42 U.S.C. § 300gg, 29 U.S.C. § 1185i, and 26 U.S.C. § 9820.

provider directories at least every 90 days.[18] Where plans are unable to verify provider data, they must establish a procedure to remove providers from their directories.[19] Health plans must also update provider information within two days of receiving an update from a provider.[20]

39.    The law also imposes obligations on health insurers directly towards their members. When a member requests information about whether a provider is in-network, the plan must respond within one day of the request.[21] And where a member relies on inaccurate provider directory information and mistakenly receives services from an out-of-network provider, the member will not be responsible for cost sharing greater than in-network cost sharing.[22]

40.    A health plan is also required to remove providers where it cannot verify the provider's status, independently of provider obligations.[23]

41.    New York State passed its own no-surprises law in 2015, which also requires health plans to ensure the accuracy of their provider directories. Under New York law, health insurers are required to update their provider directories within an even shorter time period – within 15 days of the "addition or termination of a provider from the insurer's network or a change in a physician's hospital affiliation" – and otherwise update their plans' directories

---

[18] 42 U.S.C. § 300gg-115(a)(2)(A).

[19] 42 U.S.C. § 300gg-115(a)(2)(B), (C).

[20] *Id.*

[21] 42 U.S.C. § 300gg-115(a)(3)(A), (B).

[22] 42 U.S.C. § 300gg-115(b)(1)(A), (B).

[23] In addition, the terms of the contract between provider and plan may require the plan to remove the provider if the contract terminates.

annually.[24] State law also requires health plans to include in their directories whether a provider is accepting new patients and any restrictions on a provider's availability.[25]

42.    Since state laws are not pre-empted by the No Surprises Act,[26] and as made clear by New York's Department of Financial Services, health plans in New York are still required to update their directories within 15 days of a provider change.[27]

43.    These federal and state laws reflect governments' recognition of the harmful consequences of inaccurate provider directories. Despite these legislative efforts to shield consumers from ghost networks, surprise bills, and inadequate in-network care, insurance companies in general, and the Defendant in particular, continue to violate these laws.[28]

---

[24] N.Y. Ins. Law § 3217-A(a)(17).

[25] *Id.*

[26] "Nothing in this section shall be construed to preempt any provision of state law relating to health care provider directories." 42 U.S.C. § 300gg-139(e).

[27] NYS Dept. Fin, Insurance Circ. Ltr, No. 12 (Dec. 29, 2021), https://www.dfs.ny.gov/industry_guidance/circular_letters/cl2021_12 ("[T]he NSA does not preempt any provision of state law relating to health care provider directories. Insurance Law §§ 3217-a(a)(17) and 4324(a)(17) and Public Health Law § 4408(1)(r) require an issuer to annually update its provider directory, with certain updates to the provider directory on the issuer's website completed within 15 days as described above. The Insurance Law and Public Health Law requirements for provider directory content and updates within 15 days continue to apply at this time.").

[28] *See, e.g.*, Neel M. Butala et al., *Research Letter: Consistency of Physician Data Across Health Insurer Directories*, JAMA 329(10), 842 (Mar. 14, 2023), https://jamanetwork.com/journals/jama/article-abstract/2802329 (finding even after passage of No Surprises Act that "[i]n examining directory entries for more than 40% of US physicians, inconsistencies were found in 81% of entries across 5 large national health insurers").

**B.    Federal and New York State Law Require Health Plans to Ensure Sufficient In-Network Mental Health Providers**

44.    There is an additional set of federal and state laws implicated by inaccurate provider directories: "network adequacy" laws require that health plans offer a network that includes a "sufficient" number of in-network providers.

45.    The Affordable Care Act first established this "network adequacy" framework, requiring that all qualified health plans[29] ensure the provision of a network that is "sufficient in number and types of providers, including providers that specialize in mental health and substance use disorder services, to ensure that all services will be accessible without unreasonable delay."[30]

46.    New York State adopted this standard and applied it broadly to a majority of health plans offered in the state. New York law requires health plans to "ensure that the network is adequate to meet the health needs of insureds and provide an appropriate choice of providers sufficient to render the services covered under the policy or contract."[31]

47.    Specifically, New York guidance provides "preferred time and distance standards," advising that mental health providers should be accessible within 30 minutes by public transportation and/or 30 miles by car.[32] The guidance also states that, "to be considered accessible, the network should contain a sufficient number and array of providers to meet the diverse needs of the insured population and to ensure that all services will be accessible without

---

[29] "Qualified health plans" are plans sold on a state or federal exchange. 42 U.S.C. § 18021.

[30] 45 C.F.R. § 156.230.

[31] N.Y. Ins. Law § 3241(a).

[32] *See Network Adequacy Standards and Guidance*, N.Y. State Dep't of Fin. Servs., https://www.dfs.ny.gov/apps_and_licensing/health_insurers/nyoon_law_guidance_questions_federal_ns_act.

undue delay. This includes being geographically accessible (i.e., meeting time/distance

standards) and being accessible for people with disabilities."[33]

48.    The Defendant is in violation of federal law requiring network adequacy.

49.    As discussed below, a significant collateral consequence of an inaccurate, inflated

provider directory is that an insurance plan appears to meet network adequacy requirements,

when it does not.

50.    This, too, was highlighted during the recent Senate Finance Committee hearing:[34]

SENATOR WARREN: Do these ... plans stand to gain anything from having inaccurate information? In other words, is it inaccurate because you just haven't spent enough money to make it accurate, or is it inaccurate by design?

MS. GILIBERTI (the Chief Public Policy Officer of Mental Health America): Well, I think there are advantages they have when their directories are unfortunately inaccurate. They use those directories for network adequacy standards.[35]

## III.    Ghost Networks

### A.    The United States Senate Finance Committee Ghost Networks Hearings

51.    In May 2023, the United States Senate Finance Committee held a hearing on this

exact topic, titled "Barriers to Mental Health Care: Improving Provider Directory Accuracy to

Reduce the Prevalence of Ghost Networks."[36] One testifying witness, a former official in the

---

[33] *Id.*

[34] This exchange focused on Medicare Advantage plans in particular, but it would apply to many other health plans.

[35] *Barriers to Mental Health Care: Improving Provider Directory Accuracy to Reduce the Prevalence of Ghost Networks*, U.S. Senate Fin. Comm. (May 3, 2023), https://www.finance.senate.gov/hearings/barriers-to-mental-health-care-improving-provider-directory-accuracy-to-reduce-the-prevalence-of-ghost-networks [hereinafter Senate Hearings on Mental Health Care](testimony of Senator Elizabeth Warren).

[36] *See id.*

Obama Administration, summarized her Sisyphean experience trying to find a mental health provider through her insurance plan's directory:

> I was left to navigate the … provider directory to find a psychiatrist. Calling psychiatrists within D.C. and Maryland, selected out of what was like a digital white-pages phone book, turned into one rejection after another. Call after call resulted in the following types of responses:
>
>> "Who? Hmm, s/he doesn't work here. No, I don't know where s/he works now."
>>
>> "Who? I don't know who that is, not sure they ever worked here. Hold please ... . [dial tone]."
>>
>> Recorded message: "Dr _____ is no longer accepting new patients. If this is an emergency, hang up and call 911."
>
> I spent countless days and hours scouring the network, despite working long hours in a high-level management position. When was there time to find a psychiatrist? I had to make the time, though, as my job, and more importantly my life, depended on it. Continued attempts finally led me to a psychiatrist who was taking new patients. Success, though, was short-lived. In our phone conversation to set up an initial in-person appointment, I was asked about my diagnosis. I had no worry or fear; this doctor, this psychiatrist, was taking new patients. I respond without hesitation – schizophrenia. A pause, a long silence ... and then the response:
>
>> "Oh....I do not take patients with a schizophrenia diagnosis."
>
> I ask if they have any suggestions or referrals to help me find a doctor who does. The answer is:
>
>> "Check the provider directory."[37]

52.     The prevalence, and degree, of ghost networks of mental health providers is nothing short of astonishing. A study recently conducted by the Senate Finance Committee majority staff reviewed 12 different directories across six states and were only able to make

---

[37] *Id.* (Testimony of Keris Jän Myrick).

appointments with 18 percent of the mental health providers contacted[38] – i.e., over 80 percent of the listed in-network providers were in reality "either unreachable, not accepting new patients, or not in-network."[39] For one state, no successful appointments could be made.[40] Another study from 2015 resulted in an appointment with a psychiatrist only 26 percent of the time.[41]

53.    Almost all people seeking a mental health provider on a ghost network spend countless, difficult hours searching for care.[42] This is dangerously exacerbated by the fact that the person may be experiencing a mental health emergency. As explained by Dr. Robert Trestman, representing the American Psychiatric Association, at the Senate Finance Committee hearing:

> For those who are healthy and well educated, going through an inaccurate provider list and being told repeatedly that "we are not taking new patients," "this provider has retired," "we no longer accept your insurance," or leaving a message with no one returning the call is at best frustrating. For people who are experiencing significant mental illness or substance use disorders, the process of going through an inaccurate provider directory to find an appointment with someone who can help them is at best demoralizing and at worst set up to precipitate clinical deterioration and a preventable crisis. Many are already experiencing profound feelings of worthlessness, fear, grief from loss and trauma, and/or the impact of substance use; some are in crisis and suicidal. Patients have told me that they felt rejected repeatedly or that somehow they themselves were at fault. Even when they make the effort to reach

---

[38] *Majority Study Findings: Medicare Advantage Plan Directories Haunted by Ghost Networks*, Senate Comm. on Finance (May 3, 2023), https://www.finance.senate.gov/imo/media/doc/050323 Ghost Network Hearing - Secret Shopper Study Report.pdf [*hereinafter* Secret Shopper Study Report].

[39] *Id.* at 1.

[40] *Id.* at 7.

[41] Malowney et al., *Availability of Outpatient Care From Psychiatrists: A Simulated-Patient Study in Three U.S. Cities*, Psychiatry Online (2015), https://ps.psychiatryonline.org/doi/full/10.1176/appi.ps.201400051.

[42] In the study conducted by the Senate Finance Committee majority staff, "[c]all times ranged from 1-3 hours to contact 10 listings per plan." *See* Secret Shopper Study Report, *supra* note 38.

out to find help, something that can be very difficult anyway, their efforts to cull through an inaccurate provider list results in more rejection and failure, exacerbating these feelings. Some give up looking for care. Others delay care.[43]

54.    At the same hearing, Senator Thom Tillis spoke of his own personal experience seeking care when suffering from mental illness:

> Back in 2007, I was diagnosed with an illness that required me to take medications that caused me to have pharmacologically induced mania followed by clinical depression, so I got a window into mental health that I consider to be a blessing … . When I'm in mania[,] I simply would not have sought a health care or a behavioral health professional. And when I was in depression, if I went to a website and went through [the provider directory], I'd have said what's the use. So we need to understand this has real life consequences. And you're in the worst possible state to have the complexity, and maybe even in the middle of depression, finding out that you have to pay out of network costs, so now you've got financial stressors, you've got whatever the underlying condition is, the insurers and providers, everybody needs to understand that.[44]

55.    The government's findings described above are disturbing, and the barriers to mental health care caused by ghost networks are devastating. Obstructions to treatment manifest in several ways. Because people in need are unable to find a mental health provider covered by their insurance on their plan's provider directory, urgent mental health treatment is often delayed and, at worst, abandoned completely. Others seeking care rely on the directory to find a provider, only to find out later that the provider is not covered by their plan, and so they are subject to significant, unexpected costs. And, in other cases, people urgently seeking care knowingly settle for seeing an out-of-network provider because they desperately need help, and it is their only option. They are left to figure out how to shoulder the often-exorbitant costs that follow.

---

[43] Senate Hearings on Mental Health Care, *supra* note 35 (Testimony of Robert L. Trestman, PhD, MD).

[44] Senate Hearings on Mental Health Care, *supra* note 35 (Testimony of Senator Thom Thillis).

56.    Yet another consequence of a ghost network is that individuals selecting an insurance plan in the first place may incorrectly choose that plan either because the provider they already see is listed on the plan's directory or because there appears to be a robust network of potential providers. The plan's ghost network is the enticement: but for a plan's ghost network, consumers may have made different health care and financial decisions.

57.    Though the effects of ghost networks are far-reaching and complex, the wrongful conduct at issue is simple: insurance companies' ghost networks mislead consumers to buy health plans that they say include a network of providers when they do not. As Senator and Chairman of the Senate Finance Committee Ron Wyden stated in his opening remarks at the Senate's hearing on ghost networks, insurance companies are at fault and their wrongdoing is clear:

> [W]hen insurance companies host ghost networks, they are selling health coverage under false pretenses, because the mental health providers advertised in their plan directories aren't picking up the phone or taking new patients. In any other business, if a product or service doesn't meet expectations, consumers can ask for a refund….
>
> In a moment of national crisis about mental health, with the problem growing exponentially during the pandemic, the widespread existence of ghost networks is unacceptable. When someone who's worried about their mental health or the mental health of a loved one finally works up the courage to pick up the phone and try and get help, the last thing they need is a symphony of "please hold" music, non-working numbers, and rejection.
>
> Just take a moment and think about the impact that might have on an individual who's already in a challenging situation. It's not hard to imagine how many Americans simply give up and go on struggling without the help they need….
>
> I want to conclude by talking about accountability. My view is that insurance companies have gotten a free pass for too long letting ghost networks run rampant. If a student were writing an essay and 80 percent of their citations were incorrect or made up, they'd receive an "F." If a business gave the SEC false or incorrect information, it would face extremely severe consequences. So in my view insurance companies

should face strict consequences if their products don't live up to the billing. That's the least that should be done....[45]

**B.    The New York Attorney General's Study**

58.    In December 2023, the New York State Office of the Attorney General ("OAG") issued a report entitled, "Inaccurate and Inadequate: Health plans' mental health provider network directories." This report was an overview of the provider directories provided by the health insurance companies operating in New York, including Defendant Anthem.[46]

59.    According to the report, the OAG "surveyed nearly 400 mental health providers listed on health plans' networks and found that the overwhelming majority, 86 percent, were 'ghosts,' meaning they were unreachable, not-in-network, or not accepting new patients. Inaccurate network directories are worsening the statewide mental health crisis and disproportionately impact marginalized communities, leading to adverse health outcomes, and increasing costs for patients."[47]

60.    The OAG stated:

New Yorkers struggling with mental health conditions rely on health plan provider directories to access affordable, quality health care services. However, when provider directories contain inaccurate listings or unavailable providers – known as ghost networks – patients may be unable to access treatment using their

---

[45] *Wyden Calls for Action to Get Rid of Ghost Networks, Releases Secret Shopper Study*, U.S. Senate Fin. Comm., Chairman Ron Wyden (May 3, 2023), https://www.finance.senate.gov/imo/media/doc/Wyden%20Ghost%20Networks%20Hearing%20Remarks%205.3.23.pdf.

[46] Office of the New York State Attorney General Letitia James, *Inaccurate and Inadequate: Health Plans' Mental Health Provider Network Directories* (2023), https://ag.ny.gov/sites/default/files/reports/mental-health-report_0.pdf.

[47] Press Release, *Attorney General James Uncovers Major Problems Accessing Mental Health Care through Insurance Companies* (Dec. 7, 2023), https://ag.ny.gov/press-release/2023/attorney-general-james-uncovers-major-problems-accessing-mental-health-care.

health insurance benefits. As a result, they are forced to choose between paying out-of-pocket, which is not possible for many, or forgoing treatment altogether.[48]

### C.    The OAG's Secret Shopper Survey of Defendant Anthem

61.    Defendant Anthem was one of 13 health providers in New York that were the subject of the OAG's investigation.

62.    The OAG tried to reach 13 mental health providers for adults who are supposedly in the Anthem plan's network. The OAG found that only five were actually in-network; and of those, the OAG was only able to make in-person appointments at two. The OAG concluded that the "ghost percentage" of Defendant Anthem for adults was 67%.

63.    The OAG's findings for providers who treated children was even worse. The OAG called seven providers who were supposedly in-network with the Anthem plan and treated children. Only four of the seven were actually in-network; and the OAG was not able to make an appointment with any of them. The OAG reported Anthem as having an abysmal 100% ghost network for children.

### D.    Additional Investigations of Ghost Networks

64.    On a national scale, the issue of ghost networks and their attendant harms to consumers at large has been reported by *The New York Times*,[49] *The Washington Post*,[50] and many other significant publications.[51]

---

[48] *Id.*

[49] Jay Hancock, *Insurers' Flawed Directories Leave Patients Scrambling for In-Network Doctors*, N.Y. Times (Dec. 3, 2016), https://www.nytimes.com/2016/12/03/us/inaccurate-doctor-directories-insurance-enrollment.html.

[50] Katherine Ellison, *73 doctors and none available: How ghost networks hamper mental health care*, WASH. POST (Feb. 19, 2022), https://www.washingtonpost.com/health/2022/02/19/mental-health-ghost-network/.

[51] *See, e.g.*, Abigail Burman, *Laying Ghost Networks to Rest: Combatting Deceptive Health Plan*

(continued…)

65.    The American Medical Association co-authored a white paper on some of the financial and non-financial injuries from ghost networks:

> When directory information is inaccurate, patients experience inconvenience (non-working phone numbers, longer time to find the right practitioner), and financial consequences (unplanned out of pocket expenses). Directory errors may also result in a patient selecting a health plan based on inaccurate information about which clinicians are in-network.[52]

66.    A March 2022 report by the United States Government Accountability Office corroborated the findings outlined above, concluding that "consumers with coverage for mental health care experience challenges finding in-network providers[,]"[53] and that "[i]naccurate or out-of-date information on which mental health providers are in a health plan's network contributes to ongoing access issues for consumers and may lead consumers to obtain out-of-network care at higher costs to find a provider."[54]

67.    The federal Centers for Medicare & Medicaid Services similarly identified network directory inaccuracies, including those "with the highest likelihood of preventing access to care."[55]

---

*Provider Directories*, 40 Yale L. & Pol'y Rev. 78, 85 (2021).

[52] *Improving Health Plan Provider Directories*, CAQH & Am. Med. Ass'n., 3, https://www.caqh.org/sites/default/files/other/CAQH-AMA_Improving%20Health%20Plan%20Provider%20Directories%20Whitepaper.pdf ("Among the more common resources that patients use are health plan provider directories which, according to two surveys conducted in 2020, more than half of patients use to select a physician.") (citations omitted).

[53] *Mental Health Care Access Challenges for Covered Consumers and Relevant Federal Efforts*, U.S. Gov't Accountability Office, Report to the Chairman, Committee on Finance, U.S. Senate, 2, (Mar. 2022), https://www.gao.gov/assets/gao-22-104597.pdf.

[54] *Id.* at 12.

[55] *Online Provider Directory Review Report*, Ctrs. for Medicare & Medicaid Servs., 1, https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/Downloads/

(continued…)

68.    In a study of adolescent psychiatrists in particular, researchers posing as parents seeking care for a child with depression were only able to obtain an appointment 17 percent of the time.[56]

69.    The crisis in access to mental health treatment is exacerbated by barriers to care imposed by health insurance companies, including the prevalence of ghost networks.[57]

## FACTUAL ALLEGATIONS

### I.    Plaintiffs' Needs for Mental Health Care

#### A.    Ms. Cavallaro-Kearins

70.    Plaintiff Patricia Cavallaro-Kearins is a resident of New York. She has been a member of the Anthem health insurance plan known as the Blue Cross Blue Shield Service Benefit Plan FEP Blue Standard Option ("Standard Option Plan") since January 1, 2019. Ms. Cavallaro-Kearins has paid a monthly premium of $571.63 for the Anthem Standard Option plan since her enrollment and has spent thousands of dollars on those premiums.

---

Provider_Directory_Review_Industry_Report_Round_3_11-28-2018.pdf.

[56] Shireen Cama et al., *Availability of Outpatient Mental Health Care by Pediatricians and Child Psychiatrists in Five U.S. Cities*, Int'l J. Health Serv. 47(4) (2017), https://pubmed.ncbi.nlm.nih.gov/28474997/ (studying availability of outpatient pediatrician and child psychiatry availability and finding that "[a]ppointments were obtained with 40% of the pediatricians and 17% of the child psychiatrists. The mean wait time for psychiatry appointments was 30 days longer than for pediatric appointments. Providers were less likely to have available appointments for children on Medicaid.").

[57] *See, e.g.*, Katherine Ellison, *73 doctors and none available: How ghost networks hamper mental health care*, WASH. POST (Feb. 19, 2022), https://www.washingtonpost.com/health/2022/02/19/mental-health-ghost-network/; Jack Turban, *Ghost networks of psychiatrists make money for insurance companies but hinder patients' access to care*, State News (June 17, 2019), https://www.statnews.com/2019/06/17/ghost-networks-psychiatrists-hinder-patient-care/ ("The numbers, however, never seem as bad for other specialties as they do for psychiatry.").

71.    Ms. Cavallaro-Kearins relied on Anthem's representations – through its online advertising, its website, its online directory, and other Anthem resources – when choosing which health insurance plan to enroll in, and in utilizing the plan. These resources include Anthem's "Benefits at a Glance,"[58] the "Benefit Summary Book,"[59] the "Service Benefit Plan"[60] (also known as the "brochure" and "official statement of benefits"), and the "Find a Doctor" online resource.[61] She specifically relied on Anthem's representations that it offered an adequate network of mental health providers.

72.    Ms. Cavallaro-Kearins has been medically diagnosed with attention deficient hyperactivity disorder ("ADHD"). She requires mental health care and pharmaceutical drugs to treat her condition.

73.    In 2020, with the onset of the COVID-19 pandemic, Ms. Cavallaro-Kearins' ADHD was worsening and coupled with increasing anxiety. She decided that she must seek care for both her anxiety and ADHD. Because ADHD medications are controlled substances, the care had to be provided by a provider licensed to prescribe such medication such as a psychiatrist or other medical doctor.

---

[58] Blue Cross Blue Shield Federal Employee Program, *2024 Benefits At A Glance*, www.fepblue.org/-/media/PDFs/Brochures/508-2024-Benefits-at-aGlance.pdf [hereinafter *Benefits at a Glance*].

[59] Blue Cross Blue Shield Federal Employee Program, *2024 Benefit Summary Book*, www.fepblue.org/-/media/PDFs/Brochures/2024/508_2024_BenefitSummaryBook_interactive.pdf [hereinafter *Benefit Summary Book*].

[60] Blue Cross Blue Shield Federal Employee Program, *Blue Cross and Blue Shield Service Benefit Plan (FEP Blue Standard and FEP Blue Basic Option)*, www.fepblue.org/-/media/PDFs/Brochures/Standard-and-Basic-Option-brochure-2024.pdf [hereinafter *Brochure*].

[61] Blue Cross Blue Shield Federal Employee Program, *Find A Doctor*, https://www.fepblue.org/find-doctor.

74.    As advertised by her insurance plan and as she would with other health care, Ms. Cavallaro-Kearins turned to her insurance's online provider directory of in-network providers to find a psychiatrist. She began to call providers. She repeatedly found that many providers included in the directory were listed with inaccurate telephone numbers – making it impossible to reach them; others did not practice the specialties listed for them in the directory; and many simply did not accept her Anthem insurance. She spent hours, days, and months calling providers and could not find a single available, in-network provider using Anthem's online provider directory.

75.    Frustrated, but determined to find care, she reached out to Anthem not once, but twice to ask for an updated list of in-network providers. Ms. Cavallaro-Kearins began calling providers on those lists. And once again, she was unable to find an available in-network provider.

76.    The inaccurate provider directory delayed her treatment and left her with two options: forgoing essential medical care or paying out of pocket for treatment. She needed the care and had to resort to paying out of pocket for out-of-network providers because there were no in-network providers within a reasonable distance of her home. Ms. Cavallaro-Kearins had to spend thousands of dollars on out-of-network providers. And the reimbursement from Anthem was a tiny fraction of her out-of-pocket costs.

77.    Ms. Cavallaro-Kearins first turned to "Done.," an online ADHD assessment and prescription service. She used "Done." for multiple months paying a monthly subscription for her medication management.

78.    However, this treatment was not sufficient to address her ongoing anxiety and she wanted to be seen regularly by a physician for her ADHD and related medication management.

79.    She once again turned to Anthem's online provider directory and was again unable to find an available in-network provider. She was again left with no other option than to go out-of-network.

80.    In September 2021, Ms. Cavallaro-Kearins began seeing an out-of-network provider, paying $240 a week out-of-pocket and upfront. From September 2021 to February 2022, she paid $240 a week and had to mail the requests for reimbursement. On numerous occasions, Anthem responded to her requests by saying that it never received the requests for reimbursements. Two to three times Ms. Cavallaro-Kearins had to mail in the statements, increasing her anxiety, stress, and frustration while paying out of pocket for mental health services that should have been covered by her insurance to begin with.

81.    Because of the significant out-of-pocket expense of being treated by an out-of-network provider, Ms. Cavallaro-Kearins continued to try to use Defendant's directory throughout the period of October 2021 through February 2022 and to the present to try to find in-network providers. Throughout this period from October 2021 through the present, Ms. Cavallaro-Kearins found the Defendant's provider directory to be grossly inaccurate.

82.    She needed the care, but the out-of-network costs were not sustainable. For this reason, Ms. Cavallaro-Kearins stopped going to the out-of-network psychiatrist.

83.    When she had to stop treatment, she turned to the provider directory again, and was yet again unable to find an available, in-network provider. Periodically – holding on to hope that Anthem may have finally posted an accurate directory and driven by essential need for treatment – she picked up the phone and began calling from the list. But she has yet to find an available, in-network doctor using Anthem's provider directory.

84.    She has been unable to find a psychiatrist in-network, and only recently was able to find and see an in-network nurse practitioner.

**B.    Baby Doe**

85.    Plaintiff Jane Doe is a resident of New York and the mother of 8-year-old Baby Doe. Both Jane Doe and Baby Doe have been enrolled in the Standard Option Plan for more than five years.

86.    Ms. Doe has paid a monthly premium for the Standard Option Plan since her enrollment, and she has spent thousands of dollars on those premiums.

87.    Ms. Doe relied on Anthem's representations through its online advertising, its website, its online directory, and other Anthem resources when choosing which health insurance plan to enroll in, and in utilizing the plan. These resources include Anthem's "Benefits at a Glance," the "Benefit Summary Book," the "Service Benefit Plan" (also known as the "brochure" and "official statement of benefits"), and the "Find a Doctor" online resource. She specifically relied on Anthem's representations that it offered an adequate network of in-network mental health providers.

88.    Baby Doe has been diagnosed with an autism spectrum disorder and requires regular occupational, speech, and mental health treatment by qualified mental health providers.

89.    Plaintiff Jane Doe started looking for essential mental health care for Baby Doe in 2018.

90.    She turned to Anthem's online provider directory and began to call the listed providers using the names and numbers posted on the website.

91.    She repeatedly found that the providers included in the directory were listed with inaccurate telephone numbers; did not practice the specialties listed for them in the directory; were not in-network; or did not accept her Anthem insurance. When she did find listed providers

who were in-network with the insurance, she was told that these providers were not accepting

new patients, while other providers had waitlists of six months or more before they would accept

her child as a new patient.

92.    After hours, days, and months of calling listed "in-network" providers, Plaintiff

Jane Doe was unable to find care for Baby Doe. For Baby Doe, there were no in-network

providers with the training or experience necessary to provide adequate care within a reasonable

distance of her home.

93.    Jane Doe was unable to financially afford out-of-network care. She had to forgo

care for Baby Doe.

94.    Since 2018 and continuing through the present, she has regularly returned to the

provider directory and called listed providers to no avail. It is both frustrating and discouraging

every time Jane Doe turns to the provider directory and is unable to find care for Baby Doe.

95.    In late 2023, Jane Doe was able to secure a waitlist spot for one provider. The

provider's waitlist was six months long. Jane Doe has not yet heard from the practice that it has

an available appointment and accepts the insurance.

96.    In short, Ms. Doe could not find an in-network doctor to treat her child at the time

the child needed care. Baby Doe never received mental health care because her mother could not

find an appropriate in-network doctor.

## II.    Anthem's Health Insurance Plans

### A.    Plan Options

97.    Anthem is one of the largest health insurance providers in New York State. It is

owned by Elevance Health, one of the largest health insurance companies in the United States.

Anthem serves over a million individuals in New York State and offers multiple health insurance

plans in the State.

98.    Federal employees eligible for the FEHP benefits have a choice of approximately 37 different insurance plans offered by 14 different insurance companies.[62]

99.    Anthem is one of the authorized health insurance companies offering plans to federal employees under the FEHP. It serves more than 150,000 federal employees and their eligible family members in New York State.

100.    Anthem offers three plans to federal employees in New York State: FEP Blue Focus, Basic Option, and Standard Option.

101.    None of the three options is covered by ERISA.

102.    Each of the three plans has different deductibles, co-pays, co-insurance, and premiums, discussed below, but all three options purport to include robust in-network provider networks for mental health.

103.    The federal government pays approximately 72% of the monthly premium for the various plans that federal employees are eligible to enroll in under FEHP. The other 28% is paid by the individual employee. The individual and family contributions for the three Anthem plans in 2024 are represented below:

| Monthly Premium, 2024 | | | |
|---|---|---|---|
| | **FEP Blue Focus** | **Basic Option** | **Standard Option** |
| **Self Only** | $119.83 | $207.44 | $326.71 |
| **Self + One** | $257.58 | $517.03 | $729.82 |
| **Self + Family** | $283.32 | $568.96 | $803.14 |

---

[62] Office of Personnel Management, *2024 Plan Information for New York* (2024) https://www.opm.gov/healthcare-insurance/healthcare/plan-information/plans/2024/state/ny.

104.   The Anthem plans are preferred provider organization ("PPO") plans. That means they have a "network" of physicians, specialists, hospitals, laboratories, and other facilities. Anthem contracts with these providers and sets negotiated rates. In turn, these providers qualify as "in-network" providers, accept lower payments from the insurer, and agree to charge members an agreed-upon discounted amount.

105.   Members of Anthem who see an in-network mental health provider on an outpatient basis pay the doctor an agreed-upon amount depending on the plan in which they are enrolled:

| Payment by Patient to In-Network Mental Health Provider | | |
| --- | --- | --- |
| **FEP Blue Focus** | **Basic Option** | **Standard Option** |
| $10 per visit for first 10 visits | $35 co-pay | $30 co-pay |

106.   Each plan has slightly different deductibles.

107.   Members who see providers not within Anthem's network – "out-of-network" providers – will be subjected to a variety of additional costs: some known, some unknown.

108.   Most importantly, only members who have Anthem's most expensive plan – the Standard Option plan – can see an out-of-network provider and be covered by the plan in any way. That means that if a member who has the FEP Blue Focus plan or the Basic Option plan sees an out-of-network provider, that member will have to pay 100% of what the doctor charges.

109.   If the member has the Standard Option plan, the member will pay something less than the doctor's full charge. That is because the member gets reimbursed a small percentage of the doctor's fee. The Defendant's out-of-network reimbursement rate is pegged to a cost it refers to as its "allowance." That allowance amount is always considerably less than what the doctor

charges. Moreover, the member does not get reimbursed the full allowed amount, but only 65%

of the allowance – and that is after a $350 individual (or $750 family) deductible is met. In its

plan brochure, the Defendant gives an example of how much a member might pay:

> **Under Standard Option**, your share consists only of your deductible
> and coinsurance or copayment. Here is an example about coinsurance:
> You see a Preferred physician who charges $250, but our allowance is
> $100. If you have met your deductible, you are only responsible for your
> coinsurance. That is, under Standard Option, you pay just 15% of our
> $100 allowance ($15). Because of the agreement, your Preferred
> physician will not bill you for the $150 difference between our
> allowance and the bill. [63]

110.    Anthem's "allowance" is not discernable from its website. Thus, it is (at best) very

difficult for a member to know, in advance, how much it will cost to use an out-of-network

provider.

111.    And for a prospective member, it is essentially impossible to know – in advance –

how much that payment will be: the Defendant will not tell a prospective member what its

allowance for a procedure or treatment is without a member ID number.

112.    FairHealth is an unrelated, highly respected, non-profit resource that provides

consumers with extensive, accurate information about the cost of health care procedures.

FairHealth is not a definitive price guide, but it does provide some guidance about how much a

member might pay. According to FairHealth, CPT Code G0470, a mental health visit for an

established patient at a Federally Qualified Health Center near zip code 10704 (the Plaintiff's zip

code) would cost $418 for an out-of-network provider.[64] And $138 is the in-network (allowed)

price.

---

[63] *Brochure, supra* note 60 at 29 (this exact language also appeared in the brochures in prior
years).

[64] FairHealth Consumer, *Consumers Estimate Your Healthcare Expenses*,

(continued…)

113.   A member would have to lay out $418 for each visit to a mental health provider. Only members with the Standard Option Plan would receive any reimbursement when using an out-of-network provider. (Basic Option and FEP Blue Focus members receive no reimbursement.) Defendant would reimburse Standard Option members approximately $90 per visit.

114.   Once the member's deductible is satisfied, the Standard Option member's out-of-pocket cost per visit would be approximately $328.

115.   The member's cost for an in-network provider would be $30 (if on the Standard Option Plan) or $35 (if on the Basic Option Plan) – if she could find an in-network provider accepting new patients.

116.   Thus, the net cost (per visit) to the member for using an out-of-network provider would be:

| | FEP Blue Focus | Basic Option | Standard Option |
|---|---|---|---|
| **Out-of-Pocket Payment Per Visit** | $418 | $418 | $328 |

**B.      Defendant's Contract with the Office of Personnel Management**

117.   All of the FEHB plans offered by Anthem are governed by a contract between Anthem and the U.S. Office of Personnel Management.

118.   Pursuant to U.S. Office of Personnel Management contracting requirements, the contract requires Anthem to comply with the No Surprises Act and other federal laws, including sections 2799A–1, 2799A–2, 2799A–3, 2799A-4, 2799A-5, 2799A–7, and 2799A–8 of the

---

https://www.fairhealthconsumer.org/.

Public Health Service Act, sections 716, 717, 718, 719, 720, 722, and 723 of the Employee

Retirement Income Security Act of 1974, and sections 9816, 9817, 9818, 9819, 9820, 9822, and

9823 of the Internal Revenue Code of 1986.

119.   Section 2799A-5 of the Public Health Service Act requires health insurers to verify

and update their provider directory not less frequently than once every 90 days, remove a

provider from the directory when it is unable to verify the directory information for that provider,

and update the directory within two days of receiving new information from a provider.

120.   Section 720 of the Employee Retirement Income Security Act of 1974 requires

health insurers to verify and update their provider directory not less frequently than once every

90 days, remove a provider from the directory when it is unable to verify the directory

information for that provider, and update the directory within two days of receiving new

information from a provider.

121.   Section 9820 of the Internal Revenue Code of 1986 requires health insurers to

verify and update their provider directory not less frequently than once every 90 days, remove a

provider from the directory when it is unable to verify the directory information for that provider,

and update the directory within two days of receiving new information from a provider.

## III.    Defendant's Ghost Network

### A.    Anthem's Provider Directory

122.   Anthem affirmatively tells members: "Choosing the right health plan matters. You

want to make sure you have the coverage you need." Anthem further states that members "enjoy

… a network that includes over 1.7 million doctors."[65] Anthem also states, "Blue Cross Blue Shield has more doctors and hospitals in our network than any other insurer in the U.S."[66]

123.   At all relevant times, the Defendant published an online directory of doctors who supposedly are in-network with the Defendant. This directory is publicly available to members and non-members of Anthem's insurance plans.

124.   This online directory, for members and potential members, is the definitive resource for people to identify which providers are in Anthem's network and are thereby covered as an in-network provider.[67]

125.   This directory can be sorted and searched based on the criteria relevant to members: for example, the type of medical specialty, the distance from the member's home or office, and whether the provider does telehealth or provides in-person care.

126.   The Defendant's directory of mental health providers is a ghost network to a staggering extent. Mental health providers listed on the Defendant's directory have incorrect contact information, or include repeated entries of the same provider, making it appear that Anthem contracts with vastly more mental health providers than it does. Accordingly, the Defendant's provider directory, and representations about Anthem's comprehensive mental health coverage, are inaccurate, deceptive, and misleading.

127.   The Defendant's provider directory affirmatively misrepresents to current and prospective Anthem members that the mental health providers listed are in fact in-network and will be accessible and available for mental health services. Indeed, as described above, the

---

[65] *Benefit Summary Book*, *supra* note 59 at 1.

[66] *Id.* at 10.

[67] *See Find a Doctor, supra* note 61.

Defendant's provider directory is replete with providers who do not take Anthem and is egregiously inaccurate as to its network of mental health providers.

128.   The Defendant includes many incorrect or non-working telephone numbers in its directory. The Defendant's inclusion of multiple incorrect telephone numbers may, at first glance, appear to be no big deal. But such errors are far from trivial for a person needing mental health care for themselves or a loved one. The appearance of a phone number next to a provider's name conveys the promise that this provider is not only in-network, but available to the member – to make an appointment and get help. And the absence of a phone number would convey a very different message: that this provider should not be listed. The inclusion of incorrect telephone numbers artificially inflates the perceived size and adequacy of the Defendant's network. And the inclusion of those incorrect numbers has a detrimental impact on members who invest time and energy trying to find a mental health provider – only to be repeatedly led down a blind path.

129.   Anthem's directory can also be downloaded as a customized PDF. On the cover sheet of the customized search directory, Anthem states, "This directory is based upon information available at the time of creation. Providers may change their participation status at any time. For the most up-to-date information on provider availability, please access http://FEPBLUE.org."

130.   On the search results page, there is a link: "Click here for general Federal Employee Program provider directory disclaimers[,]" which leads to the following pop-up window:

Close

- This directory lists physicians and other providers who are part of the Preferred provider network for Basic Option, Standard Option, and FEP Blue Focus.
- Benefits are as described in the Service Benefit Plan brochures for Standard and Basic Option (RI 71-005) and FEP Blue Focus (RI 71-017).
- The continued participation of any physician, hospital, or other provider cannot be guaranteed.
- Preferred facilities may utilize Non-participating providers to provide certain medical or surgical services. Also, some services offered by a Preferred facility may not be Preferred. It is your responsibility to verify the Preferred status of a provider for the particular service you are receiving.
- The Blue Cross and Blue Shield Service Benefit Plan is prohibited from providing benefits for services performed by a debarred or suspended provider.
- Neither the Service Benefit Plan nor any local Blue Cross and Blue Shield Plan guarantees the services of health care providers.
- Blue Cross and Blue Shield Plan Providers sometimes have offices in more than one Plan area, and different contracts with the Blue Cross Blue Shield Plan in each of those areas. Please verify before receiving services that your provider is Preferred in your Plan area.
- Some services may require pre-certification and/or prior approval. Visit https://www.fepblue.org/faqs/faq-enrollment#prior-approval for more information. Please see the Blue Cross and Blue Shield Service Benefit Plan brochures at https://www.fepblue.org/plan-brochures for details on your benefits.
- All benefits are subject to the definitions, limitations, and exclusions set forth in the Federal brochures.
- Benefits are payable only when we determine that the criteria for medical necessity are met.
- Some services may require **pre-certification** and/or **prior approval**. Visit https://www.fepblue.org/faqs/faq-enrollment#prior-approval for more information. Please see the Blue Cross and Blue Shield Service benefit plan brochures at https://www.fepblue.org/plan-brochures for details on your benefits.

131.   The Defendant's disclaimer statement (above) fails to satisfy the Defendant's obligations to lawfully maintain the provider directory and to refrain from deceptive acts and practices regarding the same.

**B.    Plaintiffs' "Secret Shopper" Study**

132.   In March 2024, counsel for the Plaintiffs conducted a simulated patient "secret shopper" survey very similar in design to those conducted by the New York Office of the Attorney General and Senate Finance Committee.

133.   Plaintiffs' secret shopper survey was based upon http://FEPBLUE.org.

134.   Plaintiffs' downloaded (and customized) directory was created on March 25, 2024. The bottom of the cover page of that downloaded PDF states, "Data last updated 03/24/2024." Anthem's "Find a Doctor" online tool has a subheading that states, "You can search our nationwide directories of Preferred providers – those providers who are in our network."

135.   The "Find a Doctor" tool then asks the member (or prospective member) to choose a location and a specialty. When "Yonkers, New York," "psychiatry," and "10 miles" were put

into the tool, there were 759 results generated. After each doctor's name, it said, "In-network. Accepting new patients at this location."



136.  These results were fundamentally wrong and misleading.

137.  When searching the online provider directory, Anthem offers the option to "download" the search results at the bottom of the page. Instead of downloading the exact results, which is suggested by the pop-up limiting the number of downloadable results to 200, the downloadable results are completely different. When Counsel downloaded an Anthem directory of psychiatrists within 10 miles of Yonkers, some 4,300 names were generated. But many of those names appeared dozens of times – understandably with different addresses and telephone numbers. But Plaintiffs experienced that several doctors listed multiple times were not in network. Providing a member who is in need of mental health services with a directory that is so inaccurate is little more than an invitation for the member to dive into Alice's rabbit hole.

138.   Counsel's staff attempted to contact the first 100 provider listings from a search of Anthem Blue Cross Blue Shield's online provider directory within 10 miles of Yonkers, New York.

139.   Plaintiff Cavallaro-Kearins is a resident of Yonkers, and this study was an attempt to replicate a similar experience to when she tried to use the Anthem directory.

140.   Using the default sort and phone numbers listed on the provider directory, staff called the first 100 listings trying to secure a mental health appointment (in-person or telemedicine).

141.   In total, staff were able to speak with someone for 92 of the listings. Eight listings were completely unreachable due to non-working numbers or unreturned calls.

142.   Counsel's staff could only make an in-network appointment with seven of the providers. The rest of the listings were either not in network, not mental health providers, did not accept new patients, were not reachable, or could not get an appointment in less than six months.

143.   But even among the seven providers where an appointment could be made, members like the Plaintiff would encounter significant obstacles to getting care. Only two of the seven providers could see a patient for both medication and therapy services in a timely manner. One provider could only provide therapy services and one only offered medication management, and three providers said they had available appointments, but they were a month away from the date of the call.

144.   In a vast majority of the attempted calls, the provider was either unreachable, the listed number was incorrect, the provider was not accepting new patients, not in-network, inpatient only, or the provider had another specialty.

145.    Twenty-eight of the phone numbers listed were wrong numbers, out of service, or the person listed in the Anthem directory did not work there. Another 27 of the listings were not in-network with Anthem, did not accept Anthem, or were not accepting new patients. Another five of the doctors listed in the Anthem directory were not psychiatrists, psychologists, or therapists.

146.    An additional 23 listings were in-patient only.

147.    In short, current members of the Anthem plan would encounter severe obstacles in securing in-network care, just as Plaintiffs did.

148.    As a result, and as corroborated by named Plaintiffs' experiences, it is nearly impossible to find an available in-network mental health provider on the Defendant's provider directory.

149.    In summary, the Defendant's provider directory includes scores of providers who are not in-network with Anthem or do not accept Anthem insurance. Moreover, the Defendant's provider directory is replete with inaccuracies of all kinds, including but not limited to incorrect addresses, phone numbers, and other contact information. Finally, when a member prints out (or saves as a PDF) a directory, the search results generated for a mental health provider include multiple entries for the same provider, making it appear that Anthem has vastly more mental health providers than it does – and potentially sending a member on an even more frustrating search for an in-network provider.

### C.    Anthem's Marketing Materials and Plan Summaries

150.    In addition to publishing and maintaining an inaccurate provider directory, Anthem provides consumers with deceptive and materially misleading marketing and program materials about the Anthem plans. These materials promise mental health benefits and a robust network of in-network providers.

151.    During every year's open enrollment period, federal employees select their desired health plan. Last year's open enrollment period was from Monday, November 13 through Monday, December 11, 2023, with the plan year beginning on January 1, 2024. Once an employee selects a health plan, the employee must remain with that plan for the entire plan year (unless there is a "qualifying event" like getting married or losing a job) until the following year's open enrollment period.

152.    There are several materials that summarize, and market, the Anthem plan to federal employees during open enrollment, and at all other times during the plan year. These documents, including Anthem's "Benefits at a Glance," the "Benefit Summary Book," the "Service Benefit Plan," and the "Find a Doctor" online resource, are made directly available to both current and prospective members or are otherwise available on the Anthem website. Separately and collectively, these documents deceptively describe an insurance plan that provides comprehensive mental health care coverage, and that members and potential members rely upon and assume to be accurate.

153.    The "Benefits at a Glance" includes mental health visits.

154.    The "Benefit Summary Book" also spells out a benefit of "mental health visits." The "Service Benefit Plan" (brochure) devotes approximately three pages to mental health benefits.

155.    In addition, the benefits conveyed to Plaintiffs are found in the document known as the Brochure that is available at www.fepblue.org.  The Brochure states: "Every year, we conduct an analysis of the financial requirements and treatment limitations which apply to this Plan's mental health and substance use disorder benefits in compliance with the federal Mental Health Parity and Addiction Equity Act (the Act), and the Act's implementing regulations. Based

on the results of this analysis, we may suggest changes to program benefits to OPM."[68]  The

Mental Health Parity and Addiction Equity Act states, "The regulation provides that all plan

standards that limit the scope or duration of benefits for services are subject to the

nonquantitative treatment limitation parity requirements. This includes restrictions such as

geographic limits, facility-type limits, and network adequacy." [69]

156.   In reality, it is nearly impossible to obtain in-network mental health care, and

consumers who relied on Anthem's misrepresentations are left to suffer the consequences of

untreated mental illness, incur significant costs to afford out-of-network treatment, and pay

premiums for benefits that are illusory.

157.   In conclusion, separately and together, Anthem's representations mislead

consumers to believe that their mental health needs would be taken care of, that their in-network

coverage is comprehensive, and that they only need to look to and rely on the provider network

to find necessary mental health care.

158.   Moreover, Anthem's repeated focus on the importance of using an in-network

provider, and repeated direction of members to use the provider directory to find an in-network

provider, belies the materiality of the provider directory to consumers.

159.   Finally, Defendant's attempts to have members themselves verify that a provider is

in fact in-network does not replace, or otherwise absolve, Defendant's obligations to accurately

represent the mental health providers in its network.

---

[68] Brochure, *supra* note 60 at 100.

[69] Ctrs. for Medicare & Medicaid Services, The Mental Health Parity and Addiction Equity Act
(2023), https://www.cms.gov/marketplace/private-health-insurance/mental-health-parity-
addiction-equity.

### D.    Defendant's Omissions

160.   In addition to the affirmative misrepresentations made by the Defendant about the breadth of its provider network and comprehensiveness of Anthem's mental health care coverage, the Defendant also makes material omissions, including but not limited to failing to disclose the extent of provider directory inaccuracies; that the vast majority of in-network mental health providers are not accessible; and the limitations of Anthem's mental health coverage.

161.   Specifically, the Defendant – on the provider directory and in Anthem's marketing and plan materials – misleadingly omits any mention that members will likely face significant difficulty in finding an in-network mental health provider through the directory, or the likelihood that members will need to either resort to an out-of-network provider or delay or potentially forego care altogether.

162.   Significantly, there is also complete information asymmetry between the Defendant and consumers: the Defendant has every ability to access all the relevant information to determine whether a provider is accurately listed.[70] On the other hand, only after great difficulty and time expenditure – through trial and error, hours of calls, and extensive research – could a member become aware of the extent of the directory inaccuracies. The information is simply not readily available to the average consumer.

163.   Plaintiffs and other reasonable consumers must rely on the Defendant to accurately represent which providers are in-network for its insurance plan. The Defendant is well-aware of its directory inaccuracies, yet reasonable consumers would have no reason to think that the list of providers represented as being in their insurance plan's network would not be exactly that.

---

[70] This information includes their contracts and communications with providers, as well as billing information from which Defendant could easily ascertain the providers currently in their network.

164.  If Plaintiffs – or any reasonable consumer – had the directory inaccuracies and deficits of Anthem's mental health care coverage disclosed to them, they would have acted differently in a variety of ways, including, but not limited to, avoiding hours of fruitless searches and calls, saving and budgeting to prepare for out-of-network mental health care costs, and exploring other health plan options.

## IV.  Defendant's Misrepresentations and Omissions about Its Mental Health Care Coverage Are Deceptive

165.  The staggering inaccuracies in the Defendant's provider directory, and in Anthem's marketing and plan materials, constitute unlawful deceptive acts and practices, false advertising, and violations of statutory and regulatory requirements. Moreover, these violations are knowing, willful, and serve to unjustly enrich Defendant.

166.  The misconduct alleged in this complaint is simple but enormously harmful: the Defendant deceptively and misleadingly represents that the Anthem insurance plan has a broad network of available mental health providers, when the reality is that members often cannot obtain in-network mental health treatment.

167.  The Defendant holds itself out to consumers – through the provider directory, advertising and marketing materials, and plan materials – as adequately covering mental health care. These representations are deceptive, as Anthem does not provide an adequate or a comprehensive network of mental health providers.

168.  As discussed above, the Defendant affirmatively misrepresents the breadth of its mental health provider network to a staggering extent – with at least 85% of the providers listed on the provider directory not actually participating in Anthem's insurance network. Further, an overwhelming number of providers listed are improperly and repeatedly listed or have incorrect contact information.

169.   In addition, during its enrollment periods and otherwise, Anthem makes numerous material misrepresentations to current and potential members about the Anthem plan, including, but not limited to, the size and adequacy of the mental health provider network, that all providers on the directory would be covered at an in-network rate, the ease and availability of finding in-network care, and the comprehensiveness of mental health care coverage. It is also very difficult for members or prospective members to ascertain the "allowance" that Anthem uses to determine out-of-network reimbursement.

170.   The Defendant disseminates these uniform, deceptive misrepresentations and omissions on its provider directory and through Anthem's advertising, marketing, and program materials, such as Anthem's "Benefits at a Glance,"[71] the "Benefit Summary Book,"[72] the "Service Benefit Plan"[73] (also known as the "brochure" and "official statement of benefits"), and the "Find a Doctor" online resource.[74]

171.   At no time did the Defendant disclose the limited nature of the mental health provider network, the amount of time individuals could be expected to search for an available in-network mental health provider, or the expenditures that would likely be required to obtain mental health care.

172.   Put another way, if a member was looking to obtain mental health services from a provider on the Defendant's provider directory, the member would have no reason to believe that

---

[71] *Benefits at a Glance*, *supra* note 58.

[72] *Benefits Summary Book*, *supra* note 59.

[73] *Brochure*, *supra* note 60.

[74] *Find a Doctor*, *supra* note 61.

said provider would be out-of-network, nor that the member would have to pay substantial costs to see an out-of-network provider.

173.  Through the Defendant's representations, omissions, and bait-and-switch tactics, a reasonable consumer would understandably believe that the Anthem plan included the mental health providers that the provider directory stated it would, and that Anthem's network of mental health providers was broad and accessible. A reasonable consumer would also expect that Anthem would cover charges for services at an in-network rate for the providers it affirmatively lists as in-network on its directory, and that the consumer would not be subject to out-of-network costs for obtaining mental health care from a provider listed on the directory.

174.  The Defendant represents that it regularly monitors and updates its network for accuracy. But that is not true.

175.  Indeed, the Defendant is flagrantly violating federal law, including the No Surprises Act.

176.  Moreover, the Defendant is well-aware of its legal obligations, and the Defendant's inaccurate and misleading provider directory is not only a violation of these standards, but also a willful and knowing violation of the consumer protection laws.

177.  The Defendant willfully and knowingly maintains an inaccurate and inflated provider directory to hide its non-compliance with network adequacy standards. If the Defendant were forced to produce an accurate provider directory, it would reflect that Anthem does not maintain sufficient in-network mental health providers, in violation of network adequacy laws.

## A.    Defendant's Deceptive Representations and Omissions Are Material

178.  As countless studies have shown, provider directories and the breadth of a provider network are important to consumers' choice of health care plan and decisions about their health care. By inference, misrepresentations about a provider directory and network materially impact

consumers' health plan choices. Accordingly, the Defendant's misrepresentations about the

Anthem plan's mental health provider network and coverage are materially misleading to

consumers, in violation of consumer protection law.

179.   Consumers predominantly, and logically, rely on a health plan's provider directory

in order to find providers in their health plan.[75] As stated by the American Medical Association

and the Council for Affordable Quality Healthcare:

> Health plans are expected by their members and their contracted
> practices to display a provider directory to the public that represents an
> accurate reflection of their networks. It is the most public-facing data
> that health plans provide, and patients are dependent on accurate
> directories to access care….[76]

180.   Indeed, and as noted above, Anthem itself repeatedly directs its members to rely on

the provider directory to find an in-network provider.

181.   In addition, reasonable consumers look to the breadth of a provider network in

choosing a health plan.[77] Over half of consumers in one poll identified provider choice as the

most important non-financial consideration they make when selecting a health plan.[78] In another

---

[75] *Improving Health Plan Provider Directories*, CAQH & Am. Med. Ass'n., 3,
https://www.caqh.org/sites/default/files/other/CAQH-
AMA_Improving%20Health%20Plan%20Provider%20Directories%20Whitepaper.pdf ("Among
the more common resources that patients use are health plan provider directories which,
according to two surveys conducted in 2020, more than half of patients use to select a
physician.") (citations omitted).

[76] *Id.* at 7.

[77] *See* Statista, *Most Important Considerations for Americans in Choosing a Plan from a Health
Insurance Company as of 2016*, https://www.statista.com/statistics/654828/most-important-
considerations-for-choosing-health-insurance-plan/.

[78] *See* Linda J. Blumberg et al., *Factors Influencing Health Plan Choice among the Marketplace
Target Population on the Eve of the Health Reform*, Urban Inst. (Feb. 6, 2014),
https://www.urban.org/research/publication/factors-influencing-health-plan-choice-among-
marketplace-target-population-eve-health-reform.

survey, participants "were willing to pay $72 more for a plan that covered 30% more doctors in their area."[79] And, in a Kaiser Family Foundation survey, 60 percent of non-group health insurance enrollees reported that having a choice of providers was either "very important" or "extremely important" to them.[80] Anthem is aware of such consumer preferences.

182.   Given the materiality of provider directories and network breadth to consumer choice, the misrepresentations and omissions made by the Defendant constitute precisely the type of information upon which reasonable consumers would rely on in choosing a health plan. Having access to an adequate number of in-network, qualified doctors is one of the fundamental criteria consumers use in choosing a health insurance plan.[81]

183.   Moreover, and as discussed above, reasonable consumers would understandably rely on these misrepresentations and omissions made by the Defendant. The provider directory and network information are disseminated by the insurance company, which consumers logically view as the authoritative source of information about its in-network providers, scope of coverage, and other plan policies.

184.   Any disclaimers, such as "the continued participation of any physician, hospital, or other provider cannot be guaranteed," are woefully insufficient.

---

[79] Eline M. van den Broek-Altenburg & Adam J. Atherly, *Patient Preferences for Provider Choice: A Discrete Choice Experiment*, Am. J. of Managed Care 26(7) (July 2020), https://www.ajmc.com/view/patient-preferences-for-provider-choice-a-discrete-choice-experiment.

[80] Liz Hamel et al., *Survey of Non-Group Health Insurance Enrollees, Wave 2*, Kaiser Family Foundation (2015), https://www.kff.org/health-reform/poll-finding/survey-of-non-group-health-insurance-enrollees-wave-2/ (note that 60 percent is the combined statistic of those who reported choice of providers as "extremely important" (25 percent) or "very important" (38 percent)).

[81] *See id.*; *Most Important Considerations for Americans in Choosing a Plan from a Health Insurance Company as of 2016, supra* note 77; Blumberg et al., *supra* note 78; van den Broek-Altenburg, *supra* note 79.

185.   The Defendant's attempt to have members themselves verify that a provider listed on its directory of in-network providers is in fact in-network is cynical, inappropriate, and dangerous. The Defendant cannot shift its obligations to consumers in an effort to evade its legal duties. It is not consumers' responsibility to verify if they are being misled; instead, it is the Defendant's obligation not to mislead.

186.   The sheer extent of inaccuracy and inadequacy of the Defendant's network is hidden, dangerous and deceptive. Put another way, no reasonable consumer viewing these disclaimers would understand that up to 85% of mental health providers listed on the directory do not take Anthem insurance. Indeed, there is no disclaimer broad enough to absolve that level of deception.

**B.    Defendant Was Aware of Its Provider Directory Inaccuracy and Knew That Its Representations and Omissions Regarding the Provider Directory and Mental Health Care Coverage Were Deceptive**

187.   At all relevant times, the Defendant knew that its representations and omissions regarding its directory of mental health providers and coverage of mental health care were grossly inaccurate, deceptive, and misleading.

188.   Amongst the insurance industry itself (as opposed to consumers), it is well known that provider directories are notoriously inaccurate. There are numerous studies documenting the

prevalence of ghost networks,[82] especially for mental health providers,[83] and insurance companies – including Anthem – have been successfully sued over the issue.[84]

189.  As discussed above, the industry was recently the subject of a bipartisan congressional inquiry into ghost networks,[85] and the Senate Finance Committee held a hearing on the issue specifically in the context of mental health.[86] There are also numerous federal and state laws and regulations aimed at rectifying the problem of inaccurate provider directories, which are discussed further below, and of which the Defendant is well aware.

---

[82] *See, e.g.*, Butala et al., *supra* note 28 ("In examining directory entries for more than 40% of US physicians, inconsistencies were found in 81% of entries across 5 large national health insurers."); Jack S. Resneck Jr. et al., *The Accuracy of Dermatology Network Physician Directories Posted by Medicare Advantage Health Plans in an Era of Narrow Networks*, JAMA Dermatology 150(12) (2014), https://jamanetwork.com/journals/jamadermatology/fullarticle/1919439 (finding, after making scripted telephone calls to dermatologists listed in certain directories, that 45.5% of physician listings were duplicates, and many "dermatologists listed had incorrect contact information, were deceased, retired, or had moved, were not accepting new patients, did not accept the insurance plan, or were subspecialized;" for one plan, no appointment was obtainable).

[83] *See, e.g.*, Russell Holstein & David P. Paul III, *'Phantom Networks' of Managed Behavioral Health Providers: an Empirical Study of their Existence and Effect on Patients in Two New Jersey Counties*, Hospital Topics 90(3), 68 (2012), https://pubmed.ncbi.nlm.nih.gov/22989224/ ("Aetna's network of psychologists was the most accurate of all networks, and GHI's network of psychiatrists was the most inaccurate of all networks."); Jane M. Zhu et al., *Phantom Networks: Discrepancies Between Reported And Realized Mental Health Care Access in Oregon Medicaid*, Health Affairs 41(7) (2022), https://www.healthaffairs.org/doi/10.1377/hlthaff.2022.00052 ("Overall, 58.2 percent of network directory listings were "phantom" providers who did not see Medicaid patients, including 67.4 percent of mental health prescribers, 59.0 percent of mental health nonprescribers, and 54.0 percent of primary care providers.").

[84] *See, e.g.*, *Anthem Resolves Calif. Provider Directory Error Case*, Bloomberg Law (Aug. 17, 2016), https://news.bloomberglaw.com/health-law-and-business/anthem-resolves-calif-provider-directory-error-case.

[85] *See* Press Release, *Brown, Colleagues, Seek Information on Ghost Networks*, Sherrod Brown U.S. Senator for Ohio (Jan. 30, 2023), https://www.brown.senate.gov/newsroom/press/release/sherrod-brown-colleagues-seek-information-on-ghost-networks.

[86] *See* Senate Hearings on Mental Health Care, *supra* note 35.

190.   Put simply by a state senator, "[Insurance companies] have known about this for a long time and they haven't done anything about it. It's difficult not to assume that this kind of barrier is intentional."[87]

191.   The sheer magnitude of providers who are not in-network or do not accept an Anthem plan – at least 85% of the mental health providers listed – in and of itself reflects knowledge of the directory inaccuracies. The staggering extent of inaccuracy of the mental health providers represented as being in-network can only be the product of knowing misconduct or willful blindness.

192.   The federal government regularly surveys employees about their use and satisfaction of various benefits, including the Federal Employees Health Benefits (FEHB) Program.

193.   In June 2022, the United States Office of Personnel Management published its 2021 Federal Employee Benefits Survey Report. This survey was administered to more than 50,000 permanent employees across the federal government.[88]

194.   The objective and findings were absolutely relevant to this lawsuit:

> To gauge the overall need for mental/behavioral healthcare in the Federal workforce, participants were first asked whether there was a need for care for themselves or for a family member within the 12 months prior to completing the survey. The results were consistent with 2019 FEBS results- 28 percent of participants responded "yes", 66 percent responded "no", and six percent responded "no, but there was a need for treatment."

---

[87] Turban, *supra* note 57.

[88] U.S. Office of Personnel Mgmt., *2021 Federal Employee Benefits Survey Report*, https://www.opm.gov/policy-data-oversight/data-analysis-documentation/employee-surveys/2021-federal-employee-benefits-survey-report.pdf.

195.   Survey participants were equally clear about their difficulty accessing mental health care. As the survey report explained:

> For the six percent of participants who indicated that treatment was necessary but that it had not been obtained, a follow up question was asked to better understand what barriers Federal employees may be encountering when attempting to seek care.

| Barriers Encountered When Attempting to Seek Mental or Behavioral Health Treatment ||
|---|---|
| **Reason for Not Seeking Care** | **Percent Selected** |
| Difficulty finding an in-network provider | 33% |
| Difficulty finding providers accepting new patients | 30% |
| Could not afford treatment costs | 23% |
| Difficulty finding in-person appointments | 18% |
| Difficulty finding virtual appointments | 12% |

196.   The Defendant knew, or should have known, that members were having significant problems accessing in-network care, and that 6% of federal employees surveyed reported that they had abandoned their search for mental health care.

197.   For all of these reasons, the Defendant's misrepresentations and omissions constitute knowing and willful violations.

198.   The Defendant engaged in these knowing deceptive acts and practices to induce Plaintiffs, and all potential members and consumers, to choose the Anthem plan. These representations about the size and breadth of the mental health provider network, the ease of finding mental health treatment by using the allegedly accurate provider directory, the freedom to choose any listed in-network provider, the ability to control costs by seeing an in-network provider, and the comprehensive coverage of mental health care would induce a reasonable consumer to choose the Anthem plan.

C. **Defendant Reaps Significant Benefits from Misrepresenting Its Mental Health Provider Network and Coverage**

199.   Moreover, the Defendant knowingly and intentionally misleads consumers in order to inflate the perception, extent, and robustness of its supposed mental health provider network, which inures significant financial benefits to the Defendant, and conversely, deprives Anthem members of the benefit of the bargain for the plan that they chose.

200.   Maintaining an inaccurate provider network and proving inadequate mental health care coverage significantly boosts the Defendant's profits.

201.   As discussed above, the top considerations for consumers choosing a health plan are network breadth and provider choice. In addition to general representations made by insurers about their networks, the main source upon which consumers rely to determine a network's breadth is the provider directory.[89]

202.   Consumers are more likely to enroll in a particular plan if their provider is in-network and the provider list is robust. Thus, by misrepresenting the size and quality of its network, the Defendant attracts more customers.

203.   When a provider network appears to be extensive, it attracts many potential members and increases its share of the market; and indeed, Anthem's plan maintains a significant market share of FEHP-eligible consumers.

204.   These members' premiums are then paid to Anthem. As such, Anthem is unjustly enriched from its misrepresentations about the breadth of its network.

---

[89] *See Improving Health Plan Provider Directories*, CAQH & Am. Med. Ass'n., 3, https://www.caqh.org/sites/default/files/other/CAQH-AMA_Improving%20Health%20Plan%20Provider%20Directories%20Whitepaper.pdf ("Among the more common resources that patients use are health plan provider directories which, according to two surveys conducted in 2020, more than half of patients use to select a physician.") (citations omitted).

205.   Anthem also overcharges for its premiums because of its illusorily broad network. Every provider who is not actually in-network, or who is unavailable or unable to be contacted, represents coverage that Anthem is paid for, but that members never receive.[90]

206.   In addition, members with greater mental health care needs are disproportionately harmed by the lack of in-network providers. These higher-needs members are more likely to have to pay for out-of-network treatment or abandon their efforts to obtain mental health care altogether, thereby saving Anthem the costs associated with their care.

207.   Simply put, inaccurate directories serve to increase a plan's membership (along with their increased premiums) and, at the same time, evade the costs of covering their care.

208.   The financial incentives of intentionally inaccurate directories were discussed during the recent Senate Finance Committee hearing.[91] In an exchange between United States Senator Elizabeth Warren and testifying witness Mary Giliberti (the Chief Public Policy Officer of Mental Health America), Senator Warren inquired whether the plans were "inaccurate by design," to which Ms. Giliberti responded affirmatively:

> SENATOR WARREN: Okay so it's a way to defraud consumers. To say I have this really big list of people you could go to if you had a problem, and it turns out that really big list … is actually this little tiny list.
>
> MS. GILIBERTI: Right.
>
> SENATOR WARREN: Okay so that's one way it's to their advantage … . They get paid in effect or they make more money by being inaccurate. Did you have another one?

---

[90] See Alicia Atwood & Anthony T. Lo Sasso, *The Effect of Narrow Provider Networks on Health Care Use*, Journal of Health Economics (Dec. 2016), https://doi.org/10.1016/j.jhealeco.2016.09.007.

[91] Note that this discussion focused on Medicare Advantage plans, but the incentives are the same in commercial plans.

> MS. GILIBERTI: Well just that I think it's about 60 percent of the plans [being discussed] don't have out of network coverage so if you get really frustrated and you pay on your own then they're not paying anything.
>
> SENATOR WARREN: So the more I can frustrate you … the more you'll just go somewhere else. And that means it's not money out of their pockets.
>
> * * *
>
> SENATOR WARREN: So what we are really saying here is that it is in the financial interests of these … plans to discourage beneficiaries from accessing care … . Because here's the key that underlines this. Whatever insurers don't spend on care as a result of tactics like outdated provider directories or overly restrictive networks or inaccurate information, whatever they don't spend on care, they get to keep.[92]

209. Finally, a significant collateral consequence of an inaccurate, inflated provider directory is that an insurance plan appears to meet network adequacy requirements, even though it does not. The Defendant is thereby unjustly enriched by avoiding the compliance costs and other expenditures associated with maintaining an accurate and adequate network of mental health providers, as required by federal and state law and discussed further below.

210. As explained by a Yale Law & Policy Review article on ghost networks, the effects of the Defendant's ghost network are far-reaching and damage the very structure of our health care system:

> Directory errors cost consumers money and erode regulatory consumer safeguards. They deceive consumers about the value of the coverage they are purchasing by concealing plans' actual provider networks, subjecting consumers to predatory billing practices, and breaking the link between consumer choices and plan practices that undergirds much of the American health insurance regulatory structure.[93]

---

[92] Senate Hearings on Mental Health Care, *supra* note 35 (Testimony of Senator Elizabeth Warren).

[93] Abigail Burman, *Laying Ghost Networks to Rest: Combatting Deceptive Health Plan Provider Directories*, 40 Yale L. & Pol'y Rev. 78, 85 (2021).

**V.    Plaintiffs and Putative Class Members Have Been Injured Because of Defendant's Conduct**

211.    Simply put, the Defendant's ghost network is a dangerous obstacle to critical mental health care for the hundreds of thousands of people covered by Anthem's plan. Plaintiffs and others similarly situated – both adults and the parents of children in desperate need of mental health care – have been grievously injured by these violations and their inability to access necessary mental health treatment for their children.

212.    Mental health care networks have been known for some time for being particularly inaccurate and causing significant harms.[94] Yet insurance companies such as the Defendant have done little to improve their accuracy.

213.    As noted in a 2014 New York Attorney General Assurance of Discontinuance, "[p]ersons with mental health and substance use disorders comprise a vulnerable population, and may be reluctant to seek care."

214.    Plaintiffs have suffered enormous injury from the Defendant's violations of law. As a result of the Defendant's ghost network, Plaintiffs have struggled, or been wholly unable, to obtain mental health treatment for themselves or their children. Specifically, Plaintiffs have paid exorbitant costs to get mental health treatment because they have been forced to seek out-of-network care for themselves and for their children; have faced significant, years-long delays in receiving critical mental health care; have been unable to find care appropriate for their mental

---

[94] *See, e.g.*, Susan H. Busch & Kelly A. Kyanko, *Incorrect Provider Directories Associated With Out-Of-Network Mental Health Care And Outpatient Surprise Bills*, 39(6) Health Affairs (2020), https://www.healthaffairs.org/doi/10.1377/hlthaff.2019.01501 ("We conducted a national survey of privately insured patients who received specialty mental health treatment. We found that 44 percent had used a mental health provider directory and that 53 percent of these patients had encountered directory inaccuracies.").

health needs and have made-do with less-than-appropriate providers; and, alarmingly, have been unable to obtain needed mental health treatment altogether.

215.   The provider directory's inaccuracies and misrepresentations and omissions about Anthem's mental health care coverage are the direct causes of the harms Plaintiffs have endured. Most simply, had the provider directory been accurate, Plaintiffs would have saved countless hours of futile searching; avoided the time, costs, and emotional toll of delaying, or failing to find, needed care; and avoided the exorbitant costs of obtaining out-of-network mental health treatment. Had Anthem accurately represented its mental health care coverage, Plaintiffs would have had access to the care they were promised or made other financial and health care decisions about their mental health treatment.

## CLASS ACTION ALLEGATIONS

216.   This action is brought by Plaintiffs individually and on behalf of a class (the "Class") pursuant to Federal Rule of Civil Procedure 23(a) and (b).

217.   Plaintiffs seek certification of the following Class:

> All persons who are currently, or were previously, enrolled in Anthem's FEHP plans at any point in or after 2018 who attempted to utilize Anthem's directory of mental health providers.

218.   Excluded from the Class are the Defendant's officers, directors, employees, co-conspirators, and legal representatives, and any judge, justice, or judicial officer to whom the litigation is assigned.

219.   Plaintiffs reserve the right to amend or modify the class definition.

220.   **Numerosity.** The Class consists of many thousands of federal employees, retired employees under 65, and their dependents that are or have been members of the Anthem FEHP plans and is thus so numerous that joinder of all members is impracticable. The exact number

and identity of class members is unknown to Plaintiffs at this time but can be ascertained through appropriate discovery.

221. **Commonality and predominance.** This action is appropriate as a class action because common questions of law and fact affecting the Class predominate over those questions affecting only individual members. Those common questions include, but are not limited to, the following:

a)    whether the Defendant breached its contractual obligations by failing to comply with the No Surprises Act and/or other federal statutes, regulations, and rules with which the Defendant is contractually obligated to comply;

b)    whether the Defendant's misrepresentations regarding the Anthem FEHP plans in violation of federal law were false or misleading under New York General Business Law ("GBL") §§ 349 and/or 350, New York Insurance Law § 4226(a), and/or common law;

c)    whether such violations were willful and knowing;

d)    whether the Defendant's mental health provider directory was inaccurate or inadequate;

e)    whether the Defendant failed to disclose to members and prospective members that the provider directory was inaccurate or inadequate;

f)    whether a reasonable consumer would be misled by the Defendant's acts and practices;

g)    whether Plaintiffs and Class members are entitled to receive specific types of relief such as actual damages, and the methodology for calculating those damages;

h)    whether Plaintiffs and Class members conferred a benefit on Anthem through enrollment in the Anthem plan, payment of premiums, and not utilizing in-network providers or otherwise not obtaining mental health care; and

i)    whether equity and good conscience require restitution to Plaintiffs and Class members and/or the establishment of a constructive trust, and the amount of such restitution or constructive trust.

222.    **Typicality.** The claims asserted by Plaintiffs are typical of the claims of the Class. At all relevant times, the Defendant's provider directory was inadequate and inaccurate, and all Class members' claims arise out of this common violation of their shared statutory and common law rights. Plaintiffs, like all Class members, were subject to deceptive and misleading representations and omissions found in the Defendant's provider directory and other marketing and plan documents about the comprehensiveness of mental health coverage and the provider network. Plaintiffs' interests coincide with, and are not antagonistic to, those of the other Class members, and Plaintiffs and the Class have been damaged by the same wrongdoing set forth in this Complaint.

223.    **Adequacy of representation.** Plaintiffs will fairly and adequately protect the interests of the Class and do not have any interests antagonistic to those of the Class members. Plaintiffs have retained counsel competent and experienced in class actions and health insurance and consumer protection litigation, who are competent to serve as Class counsel. Plaintiffs and their counsel will fairly and adequately protect the interest of the Class members.

224.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a)      given the complexity of issues involved in this action, the expense of litigating the claims, and the money at stake for any individual Class member, few, if any, Class members could afford to seek legal redress individually for the wrongs that the Defendant has committed against them;

b)      the prosecution of thousands of separate actions by individual members would risk inconsistency in adjudication and outcomes that would establish incompatible standards of conduct for the Defendant and burden the courts;

c)      when the Defendant's liability has been adjudicated, claims of all Class members can be determined by the Court;

d)      this action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort, and expense, and ensure uniformity of decisions;

e)      without a class action, many Class members would continue to suffer injury while the Defendant retains the substantial proceeds of its wrongful conduct; and

f)      this action does not present any undue difficulties that would impede its management by the Court as a class action.

225. **Ascertainability.** The identities and addresses of Class members can be readily ascertained from business records maintained by the Defendant, and/or self-authentication. The precise number of Class members, and their addresses, can be ascertained from the Defendant's records. Plaintiffs anticipate providing appropriate notice to the Class to be approved by the Court after class certification, or pursuant to court order.

226. Plaintiffs request that the Court afford Class members with notice and the right to opt out of any Class certified in this action.

## FIRST CAUSE OF ACTION

### Breach of Contract

227.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

228.   Plaintiffs and the Class, as federal employees eligible to participate in the Federal Employee Health Benefits Program, are third-party beneficiaries of a contract between the Federal Office of Personnel Management and the Defendant.

229.   The contract explicitly requires the Defendant to comply with the No Surprises Act, among other federal laws, including sections 2799A–1, 2799A–2, 2799A–3, 2799A-4, 2799A-5, 2799A–7, and 2799A–8 of the Public Health Service Act, sections 716, 717, 718, 719, 720, 722, and 723 of the Employee Retirement Income Security Act of 1974, and sections 9816, 9817, 9818, 9819, 9820, 9822, and 9823 of the Internal Revenue Code of 1986.

230.   Sections 2799A-5 of the Public Health Service Act, 720 of the Employee Retirement Income Security Act of 1974, and 9820 of the Internal Revenue Code of 1986 require health insurers to verify and update their provider directory not less frequently than once every 90 days, remove a provider from the directory when it is unable to verify the directory information for that provider, and update the directory within two days of receiving new information from a provider.

231.   Defendant's failure to maintain an accurate directory of in-network providers, and other misconduct set forth in this complaint, violates the requirements in the Public Health Service Act, Employee Retirement Income Security Act, and Internal Revenue Code.

232.   The Defendant has violated the above federal laws (and, by extension, its contractual obligations to Plaintiffs and the Class) by, among other things, failing to consistently provide an accurate network directory and failing to ensure mental health network adequacy.

233.   Plaintiffs and the Class have been harmed by the Defendant's numerous contractual breaches.  Among other injuries, the Defendant's contractual breaches have caused millions of dollars in damages; forced Plaintiffs and Class members to delay and forego crucial and necessary mental health care; caused Plaintiffs and Class members significant out-of-pocket expenses for out-of-network provider payments; prevented Plaintiffs and Class members from receiving the full benefit of their bargain; prevented Plaintiffs and Class members from enrolling in a plan with better benefits (including lower costs); caused Plaintiffs and Class members to reduce spending on necessities and other life costs; prevented Plaintiffs and Class members from making informed financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress.

## SECOND CAUSE OF ACTION

### Deceptive Acts and Practices in Violation of the
### New York Deceptive Acts & Practices Act, N.Y. Gen. Bus. Law § 349

234.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

235.   The Defendant violated GBL § 349 by failing to provide Plaintiffs and the Class with the accurate information about in-network providers required by federal law, including, but not limited to, the No Surprises Act, Public Health Service Act, Employee Retirement Income Security Act, and Internal Revenue Code.

236.   GBL § 349 imposes liability on anyone who engages in "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service" in New York.

237.   Plaintiffs are "persons" under GBL § 349(h).

238.   The Defendant's actions as set forth herein occurred in the conduct of business, trade, or commerce under GBL § 349(a).

239.   The Defendant has engaged in consumer-oriented conduct that has misled and harmed Plaintiffs and the Class. The actions and practices alleged herein were directed at consumers of health insurance and were therefore consumer-oriented.

240.   In the course of business, the Defendant made deceptive affirmative misrepresentations and omissions to Plaintiffs and the Class by publishing and disseminating misleading informational and marketing materials prior to and during the open enrollment periods regarding Anthem—including Anthem's "Benefits at a Glance," the "Benefit Summary Book," the "Service Benefit Plan" (also known as the "brochure" and "official statement of benefits"), and the "Find a Doctor" online resource. The provider directory itself, which members and prospective members are directed to rely on, inflates and misleads consumers regarding the size of the network and the availability of mental health providers.

241.   False representations include, *inter alia*, that providers listed on the provider directory are in-network; that there are sufficient and available mental health care providers in that network; that members can rely on the directory to find and contact providers; and that mental health care coverage is comprehensive.

242.   Omitted and concealed from the representations were material and relevant facts that Plaintiffs and Class members would have used in selecting their health insurance plan, including, *inter alia*, the extent of inaccuracies in the provider directory; the true breadth of the provider network; the likelihood that a member seeking mental health care would have to obtain out-of-network treatment, and the costs of such services; and the number of hours and expenditures that would be needed to be made to find appropriate mental health care.

243.   These representations and omissions, when considered as a whole from the perspective of a reasonable consumer, conveyed that the Defendant's provider directory was accurate and broad, and that mental health care would be covered. A reasonable consumer would attach importance to such representations and would be induced to enroll in such a plan.

244.   These misrepresentations and omissions alleged herein were materially misleading.

245.   The acts and practices alleged herein are deceptive acts and practices covered under GBL § 349 and have caused Plaintiffs and Class members significant ascertainable monetary and non-monetary injuries. Among other injuries, the Defendant's deceptive acts and practices have caused millions of dollars in damages; forced Plaintiffs and Class members to delay and forego crucial and necessary mental health care; caused Plaintiffs and Class members significant out-of-pocket expenses for out-of-network provider payments; prevented Plaintiffs and Class members from enrolling in a plan with better benefits (including lower costs); caused Plaintiffs and Class members to reduce spending on necessities and other life costs; prevented Plaintiffs and Class members from making informed financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress.

246.   The Defendant willfully and knowingly violated GBL § 349. It made affirmative misrepresentations and omissions in its marketing materials and provider directory—in violation of federal law—in order to market the Anthem plans as comprehensive, including mental health coverage, in order to induce federal employees to choose its plans over other plans.

### THIRD CAUSE OF ACTION

**False Advertising in Violation of the
New York False Advertising Act, N.Y. Gen. Bus. Law § 350**

247.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

248.   The Defendant violated GBL § 350 by failing to provide Plaintiffs and the Class with the accurate information about in-network providers required by federal law, including, but not limited to, the No Surprises Act, Public Health Service Act, Employee Retirement Income Security Act, and Internal Revenue Code.

249.   GBL § 350 imposes liability on anyone who uses false advertising in the conduct of any business, trade, or commerce, or in the furnishing of any service in New York. "False advertising" includes "advertising, including labeling of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …." GBL § 350-a(1).

250.   The Defendant's actions as set forth herein occurred in the conduct of business, trade, or commerce under GBL § 350.

251.   The Defendant has engaged in consumer-oriented conduct that has misled and harmed Plaintiffs and the Class. The actions and practices alleged herein were directed at consumers of health insurance and were therefore consumer-oriented.

252.   A cause of action based upon false advertising is appropriate because the Defendant utilized false advertising to mislead Plaintiffs and the Class about the nature and coverage of Anthem, in violation of federal law.

253.   In the course of business, the Defendant falsely advertised the Anthem plans to Plaintiffs and the Class by publishing and disseminating misleading informational and marketing materials prior to and during the open enrollment periods including Anthem's "Benefits at a Glance," the "Benefit Summary Book," the "Service Benefit Plan" (also known as the "brochure" and "official statement of benefits"), and the "Find a Doctor" online resource. The

provider directory itself, which members and prospective members are directed to rely on, inflates and misleads consumers regarding the availability of mental health providers and the adequate size of the network, in violation of federal law.

254.  False representations include that providers listed on the provider directory are in-network; that there are sufficient and available mental health care providers in that network; that members can rely on the directory to find and contact providers; and that the mental health care coverage is comprehensive.

255.  Omitted and concealed from the representations were material and relevant facts that Plaintiffs and Class members would have used in selecting their health insurance plan, including the extent of inaccuracies in the provider directory; the true breadth of the provider network; the likelihood that a member seeking mental health care have to obtain out-of-network treatment, and the costs of such services; and the number of hours and expenditures that would be needed to be made to find appropriate mental health care.

256.  These representations and omissions, when considered as a whole from the perspective of a reasonable consumer, conveyed that the Defendant's provider directory was accurate and broad and that mental health care would be covered. A reasonable consumer would attach importance to such representations and would be induced to enroll in such a plan.

257.  The false advertising alleged herein was materially misleading.

258.  The acts and practices alleged herein constitute false advertising covered under GBL § 350 and have caused millions of dollars in damages; forced Plaintiffs and Class members to delay and forego crucial and necessary mental health care; caused Plaintiffs and Class members significant out-of-pocket expenses for out-of-network provider payments; prevented Plaintiffs and Class members from enrolling in a plan with better benefits (including lower

costs); caused Plaintiffs and Class members to reduce spending on necessities and other life

costs; prevented Plaintiffs and Class members from making informed financial and health care

decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological

distress.

259.    The Defendant willfully and knowingly violated GBL § 350. It made affirmative

misrepresentations and omissions in its marketing materials and provider directory—in violation

of federal law—in order to market the Anthem plans as comprehensive, including mental health

coverage, in order to induce federal employees to choose its plans over other plans.

**FOURTH CAUSE OF ACTION**

**Violation of New York Insurance Law § 4226**

260.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them

as if fully set forth herein.

261.    Insurance companies have a statutory obligation to provide accurate and complete

information about their health care plans. New York Insurance Law § 4226 states in pertinent

part: "No insurer authorized to do in this state the business of … health insurance … shall …

issue or circulate, or cause or permit to be issued or circulated on its behalf, any illustration,

circular, statement or memorandum misrepresenting the terms, benefits or advantages of any of

its policies or contracts."

262.    The Defendant is liable under New York Insurance Law § 4226 because (1) it is

authorized to provide health insurance in New York; (2) it misrepresented to Plaintiffs and the

Class that they would have comprehensive access to in-network mental health care, including

that the mental health providers listed on the provider directory accepted the Anthem insurance

plans, that these providers would be accessible and available, and more; (3) the

misrepresentations were material; (4) the Defendant knew that it had misrepresented the terms,

benefits, and advantages of the Anthem plans and has long been on notice of its provider directory deficiencies; (5) the Defendant knew that the "Benefits at a Glance," the "Benefit Summary Book," the "Service Benefit Plan" (also known as the "brochure" and "official statement of benefits"), the "Find a Doctor" online resource, and other documents containing the misrepresentations would be communicated to the Plaintiffs and the Class, directly and indirectly; (6) Plaintiffs and the Class received such documents and learned of the misrepresentations, directly and indirectly; (7) the Defendant did not abide by its representations; and (8) Plaintiffs and the Class were thereby injured.

263.   The Defendant issued statements via the provider directory, the "Benefits at a Glance," the "Benefit Summary Book," the "Service Benefit Plan" (also known as the "brochure" and "official statement of benefits"), and the "Find a Doctor" online resource, and other documents that materially misrepresented – through affirmative misstatements as well as omissions – the comprehensiveness of the Anthem plans and mental health care coverage.

264.   These misrepresentations were material because network breadth and access to in-network mental health providers are an important feature of a health insurance plan, one which influences health care enrollment decisions.

265.   Plaintiffs and Class members have suffered economic and non-economic injuries as a result of the Defendant's misconduct. Among other injuries, the Defendant's misconduct has caused millions of dollars in damages; forced Plaintiffs and Class members to delay and forego crucial and necessary mental health care; caused Plaintiffs and Class members significant out-of-pocket expenses for out-of-network provider payments; prevented Plaintiffs and Class members from enrolling in a plan with better benefits (including lower costs); caused Plaintiffs and Class members to reduce spending on necessities and other life costs; prevented Plaintiffs and Class

members from making informed financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress.

266.   These violations of New York Insurance Law § 4226(a) were intentional and the Defendant knowingly received premiums and other compensation as a result of such violations.

## FIFTH CAUSE OF ACTION

### Fraudulent Misrepresentation

267.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

268.   Insurance companies have a statutory obligation to provide accurate and complete information about their health care plans.

269.   The Defendant made deceptive affirmative misrepresentations and omissions to Plaintiffs and the Class by publishing and disseminating misleading informational and marketing materials prior to and during the open enrollment periods.  The Defendant's misrepresentations were conveyed in Anthem's "Benefits at a Glance," the "Benefit Summary Book," the "Service Benefit Plan" (also known as the "brochure" and "official statement of benefits"), and the "Find a Doctor" online resource. The provider directory itself, which members and prospective members are directed to rely on, inflates and misleads consumers regarding the size of the network and the availability of mental health providers.

270.   The omissions from these same resources were any reference to the limited number of mental health providers who are actually in-network with Anthem and actually accepted the Anthem insurance, or to the fact that members and prospective members have to utilize out-of-network providers – and incur substantial costs – should they need mental health services.

271.   False representations include, *inter alia*, that providers listed on the provider directory are in-network; that there are sufficient and available mental health care providers in

that network; that members can rely on the directory to find and contact providers; that Anthem

has an adequate size network; and that mental health care coverage is comprehensive.

272.   Omitted and concealed from the representations were material and relevant facts

that Plaintiffs and Class members would have used in selecting their health insurance plan,

including, *inter alia*, the extent of inaccuracies in the provider directory; the true breadth of the

provider network; the likelihood that a member seeking mental health care would have to obtain

out-of-network treatment, and the costs of such services; and the number of hours and

expenditures that would be needed to be made to find appropriate mental health care.

273.   These representations and omissions, when considered as a whole from the

perspective of a reasonable consumer, conveyed that the Defendant's provider directory was

accurate and broad, and that mental health care would be covered. A reasonable consumer would

attach importance to such representations and would be induced to enroll in such a plan.

274.   These misrepresentations and omissions alleged herein were intentional and

materially misleading.

275.   These misrepresentations and omissions have caused Plaintiffs and Class members

significant ascertainable monetary and non-monetary injuries. Among other injuries, the

Defendant's misrepresentations and omissions have caused millions of dollars in damages;

forced Plaintiffs and Class members to delay and forego crucial and necessary mental health

care; caused Plaintiffs and Class members significant out-of-pocket expenses for out-of-network

provider payments; prevented Plaintiffs and Class members from enrolling in a plan with better

benefits (including lower costs); caused Plaintiffs and Class members to reduce spending on

necessities and other life costs; prevented Plaintiffs and Class members from making informed

financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress.

276.   The Defendant willfully and knowingly made the false representations and omissions alleged herein. Its inclusion of affirmative misrepresentations and omissions in its marketing materials and provider directory was done intentionally to induce federal employees to choose Anthem over other plans, thus increasing Anthem's profits.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment

277.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

278.   The Defendant has been and continues to be significantly and unjustly enriched because of its inaccurate and inadequate mental health provider network that violates federal law. Because it portrayed its network as accurate and comprehensive, in compliance with federal law, individuals selected its plans. These deceptive representations attracted increased membership, thereby increasing Anthem's share of the marketplace.

279.   Plaintiffs and Class members have conferred a benefit on the Defendant by enrolling in Anthem plans and thereby directing their medical premiums to the Defendant.

280.   Plaintiffs and Class members have further conferred a benefit on the Defendant because the Defendant's inaccurate and inadequate network forces Plaintiffs and Class members to pay a portion of the mental health care expenses that the Defendant represented would be covered. Effectively, Anthem represents that its insurance broadly covers mental health care, yet its bait-and-switch tactics ensure that it does not pay the full costs of actually covering mental health care services.

281.   The Defendant has thus enriched itself by reaping the benefits of increased membership while reducing or eliminating its own coverage, reimbursement, and other financial duties. This and other benefits were obtained at the expense of Plaintiffs and Class members, who did not receive the full value of what Anthem represented.

282.   In addition, Anthem's inflated mental health provider network makes it appear that Anthem complies with federal requirements that its provider network be accurate and adequate, thereby saving Anthem the costs of actual compliance with these requirements – shielding Anthem from government investigation, and the associated costs, at the expense of its members.

283.   An unjust enrichment cause of action is appropriate because the Defendant failed to make restitution to Plaintiffs and Class members for the economic and non-economic harms, including out-of-pocket costs unjustly incurred, and more.

284.   It is inequitable and unjust for the Defendant to retain the benefits from falsely portraying its provider network in a way that increases enrollment while decreasing the Defendant's obligations to comply with federal law.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered as follows:

a.   declaring that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing the undersigned counsel as Class Counsel;

b.   declaring that the Defendant's actions violate federal law, including the No Surprises Act, Public Health Service Act, Employee Retirement Income Security Act, and Internal Revenue Code;

c.   awarding all injunctive relief permitted by law or equity, including injunctive relief

prohibiting the Defendant from continuing to violate federal law;

d.  awarding compensatory damages, restitution, disgorgement, and any other relief

    permitted by law or equity;

e.  awarding statutory damages and penalties in addition to actual damages;

f.  awarding treble damages;

g.  awarding punitive damages in an amount deemed appropriate by the Court;

h.  awarding Plaintiffs and the Class pre-judgment and post-judgment interest;

i.  awarding Plaintiffs reasonable attorneys' fees and costs; and

j.  awarding Plaintiffs and the Class such other relief as this Court may deem just and

    proper under the circumstances.

* * *

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: October 22, 2024

**POLLOCK COHEN LLP**

By: _/s/ Steve Cohen_
Steve Cohen
111 Broadway, Suite 1804
New York, NY 10006
(212) 337-5361
Scohen@PollockCohen.com

**WALDEN MACHT HARAN & WILLIAMS LLP**

By: _/s/ Jacob Gardener_
Jacob Gardener
250 Vesey St., 27th Floor
New York, NY 10281
(212) 335-2965
jgardener@wmhwlaw.com

*Attorneys for Plaintiffs*